**Charlotte HAHN, Plaintiff,**

v.

**Kenneth S. APFEL,[1] Commissioner of Social Security, Defendant.**

**Civil No. 3–97–CV–90084.**

United States District Court, S.D. Iowa, . Davenport Division.

Feb. 2, 1998.

Kyle D. Williamson, Davenport, IA, for Plaintiff.

Gary L. Hayward, Asst. U.S. Atty., Des Moines, IA, for Defendant.

## MEMORANDUM OPINION AND ORDER

PRATT, District Judge.

Plaintiff, Charlotte Hahn, filed a Complaint in this Court on May 21, 1997, seeking review of the Commissioner's decision to deny her claim for a period of disability and disability insurance benefits under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, 1381 *et seq.* This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g). For the reasons set out herein, the decision of the Commissioner is reversed and the Commissioner is ordered to award benefits.

### BACKGROUND

Plaintiff was born January 26, 1960 (Tr. at 140), and at the time of the hearing was 36 years old. Tr. at 56. On her application for benefits, Plaintiff's stated that she became unable to work, January 10, 1992.

On March 19, 1992, Plaintiff underwent lateral release on her right elbow. Tr. at 192. Plaintiff, who was 32 years old, had suffered from longstanding right sided elbow pain. She had undergone six cortisone injections and various methods of conservative treatment, all of which were ineffective. Tr. at 191. Plaintiff was treated by a physical therapist from March 31, 1992 until August 13, 1992. Tr. at 218. A physical therapy report for the dates June 15 to August 13, 1992, shows that Plaintiff attended 47 of 47 scheduled days for treatment. Tr. at 218. A report of an MRI, dated July 19, 1992, showed degenerative changes in the shoulder and impingement. Tr. at 208 and 302. On

1. President Clinton appointed Kenneth S. Apfel to serve as Acting Commissioner of Social Security, effective September, 29, 1997, to succeed John J. Callahan. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Kenneth S. Apfel is hereby substituted for John J. Callahan as defendant in this action.

**690**

August 19, 1992, she underwent a rotator cuff decompression and acromioplasty on the right shoulder. Tr. at 209. Plaintiff was treated with physical therapy beginning September 1, 1992 through October 14, 1992. Plaintiff, according to the physical therapy report, made good progress until September 24, 1992 when she had increased pain in her right shoulder. The physical therapy consisted of range of motion exercises, isometric strengthening, ice, ultrasound, and aquatic exercise. Tr. at 213. On October 27, 1992, the physical therapist reported that of 28 days of scheduled physical therapy, Plaintiff at attended 27. Nevertheless, Plaintiff experienced a poor result with poor improvement. The therapist noted: "Client has not been benefitting from P.T. although she has been very compliant." Tr. at 212. Physical therapy resumed November 11, 1992 and continued until November 23, 1992. On January 15, 1993, Plaintiff called the physical therapist and reported that she had been released from Dr. Crous' care and that there would be no further physical therapy. Tr. at 452–53.

On December 14, 1992, Francis Vincent, M.D., a medical consultant who reviewed the medical records, but did not examine Plaintiff, for Disability Determination Services (DDS) opined that by August, 1993, Plaintiff would be capable of medium work, i.e., lifting 50 pounds maximum and 25 pounds frequently. Tr. at 250–261. In November, 1994, another DDS medical consultant, Harry Bergmann, M.D., opined that by June, 1995, Plaintiff would be able to do the same type of work. Tr. at 477–490.

A medical examination, dated December 23, 1992, states that Plaintiff continued to complain of pain and difficulty with her right shoulder. Tr. at 264. On January 13, 1993, Robert O. Crous, III, M.D., wrote: "Charlotte has been off work for a year now. Her shoulder is fair. It is not doing too badly and she is taking Extra Strength Tylenol only." Dr. Crous continued: "We will talk to her employer, try to get her back to work for a few hours a day or on light duty." Tr. at 267. On January 28, 1993, Dr. Crous stated that Plaintiff could return to "light duty" on February 1, 1993, but that she should do no lifting with the right shoulder. Tr. at 265.

At the hearing, Plaintiff testified that she still experienced pain in her arms. She was asked what would happen if picked up a gallon of milk or juice in each hand. She responded: "That's how I learned, I'm not going to do it again.... The pain was just excruciating, you know, and it—never try it again." Tr. at 70.

A treatment note from Dennis Straubinger, D.O., dated April 28, 1993, note a "new breast lump in the superior aspect of the left breast." (Tr. P. 353) On May 6, 1993, Plaintiff underwent excision of a left breast tumor. Tr. at 309.

A report of a psychological evaluation, dated June 24, 1993, states that Plaintiff reported headaches, back pain and restless sleep as extreme. Tr. at 319. On July 1, 1993, Plaintiff was seen by Stephen C. Rasmus, M.D., a neurologist, for headaches. Dr. Rasmus noted that Plaintiff's history was significant for glaucoma treated with surgery bilaterally. Plaintiff was having two to three headaches per week which would last from two to five days. Dr. Rasmus stated that the headaches were relieved with Midrin and that Plaintiff was authorized to take up to three of them. Tr. at 315. Dr. Rasmus prescribed amitriptyline. Tr. at 316. On August 18, 1993, Dr. Rasmus wrote that Plaintiff was still having headaches which were occurring two or three times a week and once a week the headache was severe. The doctor increased the dosage of Amitripty-line. Tr. at 317. At the end of the psychological evaluation, dated June 24, 1993 (Tr. at 319–321), it was recommended that Plaintiff attend a day hospital program three days a week. Plaintiff was not sure she could attend regularly because of problems with transportation, migraines and irritable bowel syndrome. Nevertheless, Plaintiff agreed to begin the program on June 29, 1993. Treatment notes indicate that Plaintiff attended the program July 13 (Tr. at 324), July 20 (Tr. at 322), August 3 (Tr. at 323), August 16 (Tr. at 325), and August 31, 1993 (Tr. at 326). When Plaintiff was seen October 14, 1993, she was still having one or two severe head-aches each month. Tr. at 331. Plaintiff returned to see Dr. Rasmus February 15, 1994. The muscle contraction headaches were well controlled but

Plaintiff was having one or two migraine headaches per week. The dosage of Amitriptyline was gradually increased up to 150 mg. Tr. at 557. An office note dated June 14, 1994, states that Plaintiff was still having two migraines every week. Plaintiff was given a prescription for Ferapamil. Tr. at 559. On July 5, 1994, the treatment note indicates that Plaintiff had only two headaches since the previous examination. Id. On Tuesday, August 16, 1994, Plaintiff called the doctor complaining of a migraine which began the previous Sunday. Plaintiff went to her doctor's office and was given Imitrex which provided relief after 15 minutes. When Plaintiff left the doctor's office, 45 minutes after the Imitrex, she told the doctor that the headache was completely gone. Tr. at 560. At the administrative hearing, March 5, 1996, Plaintiff testified that she has migraine headaches once a week or more. Tr. at 59. Approximately once a month she will have a really bad headache that wakes her up from sleep. These headaches, and the medication she takes for them, will cause her to sleep the rest of the day. Tr. at 60. The headaches which are not as bad will go away about an hour after Plaintiff takes her medication. Thereafter, Plaintiff testified that she is exhausted and needs to sleep or rest the remainder of the day. Tr. at 62.

Plaintiff underwent laser surgery on her right eye April 8, 1993 (Tr. at 426), and July 23, 1993 (Tr. at 439). She underwent laser surgery on her left eye April 12, 1993 (Tr. at 430), July 19, 1993 (Tr. at 436), and November 8, 1993 (Tr. at 446). A report from Dr. Straubinger, dated June 9, 1993 states that Plaintiff was having loss of vision due to glaucoma. The report states: "There is no black or curtains in front of the eyes but rather a 'white out' type of phenomenon." (Tr. at 349).

On May 26, 1994, Plaintiff was seen by Dr. Crous for complaints of left elbow pain. Tr. at 457. She underwent a muscle slide on her left elbow on June 27, 1994. Tr. at 459. Plaintiff was seen for follow up examinations on July 1 and 7, 1994. Tr. at 460. A treatment note dated July 22, 1994 states that Plaintiff had injured her elbow during her exercise program. There was some swelling and the area was very tender to touch. Dr. Crous wrote: "We will keep her in a sling, decrease her activity level, thusly, and review her in a week." Tr. at 565. On July 28, 1994, Plaintiff still complained of pain and Dr. Crous noted some mild swelling, tenderness and pain with gripping. Tr. at 566. On August 17, 1994, the pain, swelling, and tenderness had improved. Tr. at 567. On September 14, 1994, Plaintiff continued to have pain, numbness and tingling in her hand. Dr. Crous noted a significant ulnar neuropathy, tenderness over the lateral epicondyle, and medial epicondylitis. Tr. at 569. Electromyographic tests done on October 4, 1994 did not show any evidence of a peripheral neuropathy or entrapment neuropathy involving the left arm and the left radial potentials were normal both at the wrist and elbow. There was no evidence of a radial nerve injury. Tr. at 570. Dr. Crous' office note of October 10, 1994 stated that Plaintiff had ongoing discomfort. The doctor also noted that Plaintiff was not working. Tr. at 571. Plaintiff saw Dr. Crous on December 22, 1994 for complaints of pain in her back. The doctor wrote: "Her examination showed her to be a 34–year–old lady in disastrous physical condition. She is very overweight. She has no muscular tone. She is generally in very poor physical condition. She has diffuse tenderness in the interscapular region and in the low back area. She has normal straight leg raise. No neurological/vascular abnormality and no other findings of note." Because of the severity of the back pain, Dr. Crous elected to do a bone scan, CBC and sed rate. The doctor concluded the report: "I suspect we will find she has muscular fascial pain only." Tr. at 574. It was noted, on December 28, 1994 that the bone scan and blood work (Tr. at 612–614) did not indicate anything other than generalized back pain on a musculofascial and degenerative basis. The doctor recommended physical therapy. Tr. at 575. On March 10, 1995, it was noted that Plaintiff had not attended physical therapy with regularity and that she still had severe back pain. The doctor recommended two weeks more physical therapy and Plaintiff was told to avoid heavy lifting. Tr. at 576. Physical therapy records for this time period are found in the record at pages 661–

632. When she was seen on March 29, 1995, Plaintiff had minimal to no pain. Tr. at 577. On May 3, 1995, Dr. Crous said that Plaintiff's back pain appeared to be non-specific and not associated with radiculopathy. The doctor noted weakness of hand grip and that Plaintiff tended to drop things. Tr. at 578. On May 10, 1995, Plaintiff complained of numbness and tingling, so Crous sent Plaintiff for a repeat of the nerve conduction studies. Tr. at 579. The studies (Tr. at 638) did not show any evidence of impingement. Dr. Crous wrote: "We discussed the ups and downs of this type of problem and she will be reviewed on a prn basis." Tr. at 580.

On May 24, 1995, Plaintiff saw Dr. Rasmus. Plaintiff reported that her migraine headaches were occurring about three times a month and responded very well to Imitrex. Tr. at 641.

Felipe P. Enriquez, M.D. wrote a report dated August 31, 1995. Dr. Enriquez stated that he saw Plaintiff, on two occasions, for evaluation of pulmonary problems of chronic cough. The doctor also stated that the pulmonary condition would not be one which would "make her unable to go back to work." Tr. at 645.

Plaintiff filed an application for disability benefits on October 28, 1992. Her application was denied initially and upon reconsideration. On August 2, 1994, Administrative Law Judge John P. Johnson (ALJ) remanded the case to the Reconsideration stage for the development of a possible mental impairment. Tr. at 463–467. The ALJ pointed to mental health treatment notes (Tr. at 318–326) discussed above. Tr. at 464. Plaintiff was seen by Stephen Paul Singley, M.A., a school and clinical psychologist, for a mental status examination on October 6, 1994. Tr. at 608–610. Mr. Singley noted that he had only been provided with "a Neurological Consultation Note dated July 13, 1994, from Stephen C. Rasmus, M.D." Tr. at 608. Apparently, no other medical records were provided. Tr. at 610 (*probably* the medical documentation in your file speaks to those issues. (Emphasis added)) Mr. Singley estimated, without the benefit of any testing, that Plaintiff's "basic intelligence to be at least strong average." Tr. at 609. He found that Plaintiff demonstrated normal mental control and no evidence of any kind of dementia. Mr. Singley wrote: "At this time, based on the information available and the interview impressions, I would not judge Mrs. Hahn to possess a diagnosable syndrome with the possible exception being a *Somatoform Disorder.* That diagnosis, however, would require a more in-depth personality assessment—such as the MMPI, for example." Tr. at 610.

Plaintiff submitted "Questionnaire As To Mental Health Residual Functional Capacity" forms filled out by a licensed clinical social worker, dated February 22, 1996 (Tr. at 673–677), and from a Doctor Avalos, dated February 27, 1996. (Tr. at 682–686). The questionnaire from Dr. Avalos was submitted on March 14, 1996 after the administrative hearing. Plaintiff was seen at the Robert Young Center for Community Mental Health dated March 12, 1996. Tr. 691–696. At the administrative hearing, Plaintiff testified that Dr. Avalos told her she suffers from a major depression and had prescribed Paxil. Tr. at 76.

At the administrative hearing, the ALJ asked a vocational expert two hypothetical questions:

My first assumption is that we have an individual who is currently 35 years old. She was 31 years old as of the alleged onset date of disability. She has—she's a female, she has a—excuse me, she's 36 years old. She is a female, she has a high school education, plus additional training as a certified nurse aid and as a—and in food management. And she has past relevant work as you've indicated in Exhibit number 78. And she has the following impairments. She has status post right rotator [cuff] decompression and acromialplasty, right elbow lateral release and left elbow muscle slide operation with complaints of pain. She has muscle contracture and migraine headaches, obesity, degenerative changes of the cervical and lumbar spine, with complaints of pain. Irritable bowel syndrome and a history of urinary incontinence. History of right middle lobe infiltrate and chronic cough. She is status post bilateral glaucoma treat-

ments, and she has a history [of] depression. And as a result of a combination of those impairments, she has the physical and mental capacity to perform work related [activities] as follows. She can lift no more than 20 pounds. She can stand—she can routinely lift ten pounds. She should do no continuous bending, stooping or squatting. No repetitive pushing or pulling. No repetitive reaching with the arms fully extended. And no repetitive work with the arms above the shoulder level. She is not able to [do] very complex or technical work. But is able to do more than simple, routine repetitive work, which does not require very close attention to detail. She should work at no more than a regular pace, using three speeds of pace, being fast, regular and slow. And she should not work at more than moderate level of stress.

Tr. at 100–01. In response, the vocational expert testified that Plaintiff would be able to do her past work as a dietary manager. In order to do so, the vocational expert explained, Plaintiff would have to be able to work at a light exertional level because the job, as described in the dictionary of occupational titles as a sedentary job: "Would be an ideal condition that is not normally found." Tr. at 102. Thereafter, the ALJ asked a second hypothetical question:

My next hypothetical would be an individual of the same age, of the sex, education, past relevant work and impairments as previously specified. And this would be an individual who would have the physical and mental capacity to perform work related activities. Except for lifting of no more than five pounds. With walking of no more than 20' to 75' at a time. Sitting of no more than an hour at a time. Standing of no more than ten minutes at a time. With no repetitive bending, stooping, squatting or climbing. No continuous—or no repetitive pushing or pulling of heavy objects. No repetitive operation of foot controls on the right. No work requiring continuous strong gripping or constant use of the hands with tactile sensation. No repetitive work with the right arm above the head. This individual is able to do only simple, routine, repetitive work which does

not require close attention to detail With no more than occasional contact with the public, coworkers and/or supervisors. However, the individual does require occasional supervision. Should not work at more than a regular pace. And should not work at more than a mild to moderate level of stress.

Tr. at 103. In response, the vocational expert testified that Plaintiff would not be able to do her past work or any other work in the national economy. Tr. at 103–04. Plaintiff's attorney asked the vocational expert what effect the migraine headaches, at a frequency of once a week, would have on the ability to work. Tr. at 107. The vocational expert said that such a limitation would preclude competitive work. Tr. at 108.

After a hearing the ALJ issued a decision on August 30, 1996, denying benefits. Tr. at 13–42. The ALJ found Plaintiff is able to do her past relevant work as a dietary manager. Tr. at 32. On April 11, 1997, the Appeals Council denied Plaintiff's request for review. Tr. at 8–10. Plaintiff filed this Complaint on May 21, 1997.

## STANDARD OF REVIEW

When reviewing a denial of benefits, we will uphold the Secretary's final decision if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Whitehouse v. Sullivan,* 949 F.2d 1005, 1006 (8th Cir.1991). Substantial evidence is that which a reasonable mind might accept as adequate to support the Secretary's conclusion. *Whitehouse,* 949 F.2d at 1006 (Citing *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971)). In assessing the substantiality of the evidence, we must consider evidence that detracts from the Secretary's decision as well as evidence that supports it. *Locher,* 968 F.2d at 727 (citing *Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir.1984)). We may not, however, reverse the Secretary's decision "merely because substantial evidence would have supported an opposite decision." *Id.* (quoting *Baker,* 730 F.2d at 1150).

*Woolf v. Shalala,* 3 F.3d 1210, 1213 (8th Cir.1993). In making this inquiry, a court should neither consider a claim de novo nor abdicate it's function to carefully analyze the entire record. *Brinker v. Weinberger,* 522 F.2d 13, 16 (8th Cir.1975).

## ALJ'S FINDINGS

Plaintiff last met the earnings requirement of the Act at the end of December, 1996. Tr. at 144. That is to say, Plaintiff must prove that she became disabled on or before that date in order to qualify for Title II benefits. *Grebenick v. Chater,* 121 F.3d 1193, 1196 (8th Cir.1997). The ALJ, following the sequential evaluation found at 20 C.F.R. § 404.1520, found, at the first step, that Plaintiff has not engaged in substantial gainful activity since January 10, 1992. At the second step, the ALJ found that Plaintiff has severe impairments: status post right rotator cuff decompression and acromioplasty, right elbow lateral release and left elbow muscle slide operation with complaints of pain, muscle contraction and migraine headaches, obesity, degenerative changes of the cervical and lumbar spine with complaints of pain, irritable bowel syndrome and a history of urinary incontinence, a history of right middle lobe infiltrated and chronic cough, status post bilateral glaucoma treatments, and a history of depression. At the third step, the ALJ found that none of Plaintiff's impairments are severe enough to meet or equal any of the impairments listed in Appendix 1, Sub-part P, Regulations No. 4. Tr. at 31. At the fourth step, the ALJ found that Plaintiff is able to do her past relevant work as a dietary manager. Tr. at 32.

## DISCUSSION

The ALJ based his finding that Plaintiff is able to do her past relevant work as a dietary manager on the testimony of the vocational expert in response to a hypothetical question that mirrors the residual functional capacity finding in the decision. Compare Tr. at 31–32 with Tr. at 101–02. The issue for the Court to decide, therefore, is whether or not the residual functional capacity finding is supported by the medical evidence in the record. As stated above, for the Court to affirm the Commissioner's findings, those findings must be supported by substantial evidence, i.e. such relevant evidence that a reasonable mind would find adequate to support the conclusion. In *Ford v. Secretary of Health And Human Services,* 662 F.Supp. 954, 955 (W.D.Ark.1987), Judge Richard Arnold, sitting by designation, stated: "The key issue in this case is Ford's RFC. **This is a medical question.**" (Emphasis added) On Page 956, of the same opinion, Judge Arnold wrote: "The issue, of course, is not whether Ford has had heart attacks, documented or not, but how his heart attacks are now affecting his ability to function physically." The most important issue in a disability claim, to use Chief Judge, then Circuit Judge, Richard Arnold's words in *McCoy v. Schweiker,* 683 F.2d 1138, 1147 (8th Cir.1982)(en banc), is residual functional capacity. On page 1148 of *McCoy,* Judge Arnold wrote: "RFC is defined wholly in terms of the physical ability to perform certain exertional tasks." It is also well settled law in the Eighth Circuit that the duty to fully and fairly develop the record of a disability case, even when the claimant is represented by counsel, lies with the ALJ. See, e.g. *Battles v. Shalala,* 36 F.3d 43, 44 (8th Cir.1994). It was with these legal principles in mind that the Court searched the record of this case to ascertain whether or not the ALJ's decision is, or is not, supported by substantial evidence in the record as a whole.

In arriving at the conclusion that Plaintiff is able to do her past relevant work, the ALJ found that Plaintiff has the residual functional capacity to lift 20 pounds occasionally and 10 pounds repetitively; no continuous bending, stooping or squatting; no repetitive pushing or pulling or reaching with arms fully extended; no repetitive work above shoulder; not able to do very complex, technical work but able to do more than simple, routine, repetitive work not requiring very close attention to detail; no more than a regular pace; no more than a moderate level of stress. Tr. at 31–32. The Court has searched this record with the proverbial fine tooth comb in an effort to find some medical evidence to support the ALJ's finding. To no avail. Nor, did the ALJ point to any medical evidence upon which his finding is

based. Rather, the ALJ made the same error committed in *Soth v. Shalala,* 827 F.Supp. 1415, 1417 (S.D.Iowa 1993), he equated a credibility finding with medial evidence of residual functional capacity.

Shortly after Plaintiff stopped working, in January, 1992, she underwent a series of surgeries on her arms. First on her right elbow, next on her right shoulder, and finally, in June 1994, on her left elbow. In between the surgeries the medical records establish that Plaintiff was treated with physical therapy. Did Plaintiff ever regain the ability to use her arms well enough to do her past work or some other work? The record does not contain any evidence to answer that question. The only doctor to venture an opinion is Dr. Crous. On January 28, 1993, Dr. Crous wrote that Plaintiff could return to work for a few hours a day or on "light duty." Tr. at 267. In the first place, the ability to work "a few hours a day" is not evidence that a person can engage in substantial gainful activity. *Willis v. Callahan,* 979 F.Supp. 1299, 1305 (D.Or.1997). In the second place, there is no indication anywhere in the record that Dr. Crous' definition of "light duty" means anything like the Commissioner's definition of "light work" found at 20 C.F.R. § 404.1567. The fact that Dr. Crous was never asked by anyone, Disability Determination Services examiners, the ALJ, or Plaintiff's counsel, about Plaintiff's residual functional capacity is a mystery to this Court. If Dr. Crous could not, or would not, provide a medical opinion of Plaintiff's residual functional capacity, a consultative examination should have been ordered.

The doctors who reviewed the medical records at the state agency do not give a good opinion about Plaintiff's residual functional capacity. On December 14, 1992, Francis Vincent, M.D., who had never examined Plaintiff, opined that by August, 1993, Plaintiff would be able to lift and carry 50 pounds occasionally, and 25 pounds frequently. Tr. at 250–61. On November 28, 1994, Harry Bergmann, M.D., another doctor who did not examine Plaintiff, opined that by June, 1995, Plaintiff would be able to lift 50 pounds occasionally and 25 pounds frequently. Tr. at 477–90. Neither doctor opined about Plain-

tiff's residual functional capacity at the time of their evaluation. Rather, they gave an opinion about what her condition would be at a time in the future.

In addition to the surgeries and physical therapy sessions on her arms, Plaintiff underwent a series of laser surgery on her eyes between April and November, 1993. Tr. at 426, 430, 439, 436, and 446. She also underwent excision of a left breast tumor in May, 1993. Tr. at 309.

Likewise, Plaintiff's mental impairment was not, in the opinion of the Court, adequately developed. On August 2, 1994, the ALJ remanded the case to Disability Determination Services to develop the possibility of a severe mental impairment. Tr. at 463–467. To that end, Plaintiff was seen by Steven Paul Singley, M.A. School & Clinical Psychologist, on October 6, 1994. Tr. at 608–10. In the first place, the Court questions whether a master's level school psychologist is an acceptable source of a medical opinion within the meaning of 20 CFR § 404.1527(a)(2). In the second place, assuming that Mr. Singley does meet the definition of an acceptable medical source, the only medical record that Mr. Singley was given to review was "a Neurological Consultation Note dated July 12, 1994" and an activities of daily living questionnaire. In *Mateer v. Bowen,* 702 F.Supp. 220, 222 (S.D.Iowa 1988), Judge O'Brien wrote: "Furthermore, the court would indicate to the Secretary that it should always provide all medical records to any physician from whom he solicits an opinion regarding any social security case." See also, *Gavin v. Heckler,* 811 F.2d at 1200. Furthermore, in spite of the fact that Mr. Singley recommended an in-depth personality assessment with a Minnesota Multiphasic Personality Inventory (MMPI) test to rule out a somatoform disorder; neither he, nor anyone else, was authorized to perform any psychological testing. Very little weight, therefore, can be given to Mr. Singley's report. Likewise, very little weight can be given to the two questionnaires as to mental health residual functional capacity filled out by Carla Mohr, and Dr. Avalos. Ms. Mohr, a clinical social worker, is not an acceptable source for medical opinion,

and the questionnaires can only be described as conclusory. If Plaintiff were as limited as the questionnaires would indicate, one would think that the treating psychiatrist could have written a report of Plaintiff's mental status, which included a diagnosis of a mental disorder, to explain why Plaintiff is so severely limited. In *Smallwood v. Chater*, 65 F.3d 87, 89 (8th Cir.1995), Judge Wollman wrote that the opinion of a treating physician is controlling: "if it 'is well-supported by medically acceptable ... diagnostic techniques and is not inconsistent with the other substantial evidence' in the record. 20 C.F.R. § 404.1527(d)(2)." In the case at bar, Dr. Alvalos offered no basis whatsoever to support his opinion that Plaintiff is limited in anyway as a result of a mental illness. Dr. Alvalos' questionnaire is inconsistent with other substantial evidence in the record such as Mr. Singley's report. Plaintiff indicated that she had been taking Paxil for depression, prescribed by Dr. Alvalos since January, 18, 1995 (Tr. at 666), and she testified, at the March 5, 1996 hearing, that she sees the doctor once a month (Tr. at 77). Nevertheless, only two pages of records, dated March 12, 1996, were submitted from the Robert Young Center for Community Mental Health, and this record would indicate a normal, or at worst mildly abnormal (on a scale of mild, moderate or severe) mental status. Tr. at 692–93.

In the opinion of the Court, this case turns on a proper evaluation of Plaintiff's ability to work in light of her migraine headaches. This is so because, while there is no medical evidence to support the finding that Plaintiff can lift, stand, sit etc., neither is there contrary evidence. If Plaintiff's impairments stemmed only from the injuries to her shoulder and arms, or from depression, the Court would remand for medical opinions of the effects of those impairments. The ALJ found, however, and the medical evidence supports, that Plaintiff suffers from migraine headaches. As pointed out in the discussion of the medical evidence, above, there is ample medical opinion that Plaintiff suffers from the migraine headaches at a frequency which will preclude the possibility of competitive work. In *Berven v. Gardner*, 414 F.2d 857, 861 (8th Cir.1969), Judge Vogel wrote:

[1] Where all of the medical testimony or expert opinions support or tend to support the claim of the appellant that she was disabled within the meaning of the statute in and prior to [the expiration of insured status] and no medical or other testimony appears to the contrary, then we believe that a finding by the Secretary to the effect that disability was not established is not supported by substantial evidence and must be set aside.

Judge Vogel, at 861, cited the case of *Celebrezze v. Warren*, 339 F.2d 833, 833 (10th Cir.1964): "On the basis of the medical evidence submitted tending to establish Warren's disability and the lack of contrary medical evidence, together with the uncontradicted evidence of continuing severe migraine headaches, the Secretary's decision was not supported by substantial evidence."

It is the holding of the Court that the evidence in this case is transparently one sided, to use Chief Judge Arnold's words in *Bradley v. Bowen*, 660 F.Supp. 276, 279 (W.D.Ark.1987), in favor of a finding that Plaintiff is precluded from working by the severity, frequency and duration of her migraine headaches. The Court further holds that, since the vocational expert has already testified that the headaches would preclude competitive employment (Tr. at 108), a remand for additional evidence would do nothing other than delay the receipt of benefits to which Plaintiff is clearly entitled. *Gavin v. Heckler*, 811 F.2d 1195, 1201 (8th Cir.1987).

### DECISION

The decision of the ALJ that Plaintiff is able to return to her past relevant work is not supported by substantial evidence on the record as a whole. Substantial evidence on the record as a whole supports a finding that Plaintiff is disabled and entitled to Social Security Disability benefits. Defendant's Motion to Affirm the Commissioner's decision is denied. **Plaintiff's Motion To Reverse The Commissioner is granted. The Commissioner is ordered to compute and award Plaintiff the benefits to which she is entitled.**

The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act.) *See Shalala v. Schaefer,* 509 U.S. 292, 113 S.Ct. 2625, 125 L.Ed.2d 239 (1993)