**Terry L. FORD, Plaintiff,**

v.

**SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant.**

**Civ. A. No. 86–1105.**

United States District Court,
W.D. Arkansas,
El Dorado Division.

June 29, 1987.

Alan Nussbaum, Nussbaum Law Firm, Little Rock, Ark., for plaintiff.

Larry R. McCord, Asst. U.S. Atty., Fort Smith, Ark., for defendant.

OPINION

ARNOLD, Circuit Judge.

Terry L. Ford, of Chidester, Ouachita County, Arkansas, brought this action to obtain judicial review of a decision of the Secretary of Health and Human Services that he is not disabled. Ford seeks disability-insurance and supplemental-security-income benefits. The case comes before the Court on motion of the defendant Secretary for summary judgment. Because the Secretary's finding that Ford is not disabled is not supported by substantial evidence on the record as a whole, this motion will be denied. Judgment will be entered in favor of the plaintiff directing the Secretary to compute and award benefits in the proper amount.[1]

---

1. The Secretary's motion for summary judgment was filed on December 29, 1986. Counsel for plaintiff neither opposed this motion nor filed a motion of their own. Counsel appear to have done nothing in this Court except to file the complaint, alleging in completely conclusory fashion that "[p]laintiff is entitled to disability income benefits under Section [sic] 216(i) and 223 of the Social Security Act as amended." Complaint ¶ V. If the Secretary's motion were nondispositive, this Court would follow its usual practice of treating the failure to oppose it as a consent to its being granted, and would enter an order granting the motion without considering the merits. But because the motion for summary judgment, if granted, would finally dispose of the case, the Court has proceeded *motu proprio*

to examine the record and decide the case as the law and the facts require.

In the normal situation, of course, denial of one side's motion for summary judgment would not result in entry of judgment for the other side, but rather in a trial of the facts. In social-security cases, however, trial is not *de novo*, but review of an administrative record already compiled. The motion for summary judgment is simply a procedural trigger for bringing the record before the Court for decision. It is appropriate, therefore, for this Court, despite plaintiff's not having filed his own motion for summary judgment, to review the record on its own (which it would have done anyway) and decide the case.

Mr. Ford was 38 years old at the time of the hearing before the administrative law judge. He has an eighth-grade education. He has worked in the past as a machine operator and a masonry helper. He claims, and the ALJ found, that he suffers from "severe coronary artery disease," Tr. 19,[2] and chronic obstructive lung disease. He has also had surgery for a ruptured disc. The ALJ found that Ford could not return to his past relevant work as a masonry helper or machine operator, and that he had no acquired work skills that would be transferable to less strenuous jobs. The ALJ also found, however, that Ford had the residual functional capacity (RFC) to do sedentary work. Therefore, as a younger individual with an eighth-grade education, Ford fit within Rule 201.25, Table No. 1, App. 2, Subpart P, Regulations No. 4, of the Medical-Vocational Guidelines, familiarly known as "the grid," and was not disabled. As the ALJ properly noted, Tr. 18, the finding that the claimant could not go back to his past jobs caused the burden of proof to shift to the Secretary. The ALJ found this burden had been successfully carried.[3]

The key issue in this case is Ford's RFC. This is a medical question. RFC means what Ford can still do despite his concededly serious impairments. If he still has the exertional ability to do sedentary work, the least strenuous category of work recognized by the Secretary's regulations, then the ALJ's use of the grid was proper, and the finding of no disability would stand. We therefore turn to an analysis of the evidence bearing on Ford's RFC.

After Ford's benefits were discontinued in 1983, he returned to work as a masonry helper. After working about two months, he had an accident with a wheelbarrow, broke his wrist, and injured his right shoulder. This was on December 13, 1983. An operation on the shoulder took place in August of 1984, and on October 22, 1984, Ford's orthopedic surgeon released him to return to work. On December 3, 1984, however, while "underpinning a house," Tr. 317 (letter of orthopedic surgeon), Ford again suffered acute pain in his shoulder, and a pain-killing drug had to be injected.

Then, on January 8, 1985, Ford went to a hospital, the Twin Rivers Medical Center in Arkadelphia, Arkansas, for what appears to be his most serious problem, heart disease. Ford has had one or more heart attacks. The record is not entirely clear as to how many, or as to exactly when they occurred, but the objective fact of one or more such episodes is firmly established. The ALJ's opinion at one point implies doubt as to the reality of any such events, by referring to "undocumented myocardial infarctions in 1976 and 1984," Tr. 14, but the ALJ himself later refers to "heart disease documented by acute posterior myocardial infarction in the late 70's," id. at 15. The source of the ALJ's initial reference to Ford's heart attacks as "undocumented" is not clear. The only supportive record reference we can find is in a form filled out in late 1985 by a state disability examiner. This form, called "Disability Determination Rationale," mentions "a history of undocumented myocardial infarctions in 1976 and 11/84," Tr. 233, but the very same form also says that an "[e]chocardiogram of 1/11/85 revealed a posterior myocardial infarction," ibid. Both Dr. Robert A. Dorman, an internist who treated Ford in the hospital at Arkadelphia, Tr. 319, and Dr. S.K. Pandit, a cardiovascular specialist who saw Ford at the ALJ's request, Tr. 352, expressly refer to Ford's heart attacks as documented. Dr. Pandit, the Social Security Administration's consulting physician, describes Ford as "having suffered myo-

**2.** This citation is to the administrative transcript, filed as an exhibit to the Secretary's answer.

**3.** Ford was previously found disabled and awarded benefits, for a period beginning December 2, 1976, largely on the basis of back problems. Benefits were terminated in March of 1983 when the Secretary found that Ford's disability had ceased. No review of this finding was sought. This Court has no jurisdiction to review it now, see *Califano v. Sanders,* 430 U.S. 99, 107–08, 97 S.Ct. 980, 985, 51 L.Ed.2d 192 (1977), and takes as a given that Ford was not disabled in March of 1983. Our review of the evidence has therefore concentrated on events and medical records, relating primarily to heart trouble, since that time.

cardial infarctions at least X2 in the past. Evidently these heart attacks have been well documented." *Ibid.* Dr. Dorman, moreover, states that Ford's "EKG [electrocardiogram] was felt to be consistent with a previous myocardial infarction," Tr. 336, a form of words commonly used by physicians, who are commendably cautious in such matters, to mean that his EKG shows he has had a heart attack.

The issue, of course, is not whether Ford has had heart attacks, documented or not, but how his heart attacks are now affecting his ability to function physically. Dr. Dorman summarized his view as follows: Ford "has had several episodes of syncope [blackouts] and currently does have unstable angina [chest pain].... Timolol and Procardia ... appear to be unsatisfactory in controlling his pain.... In his current state, he is totally disabled for any manual labor." Tr. 348. Ford's chest pain, according to Dr. Dorman, had become increasingly severe beginning about the middle of 1984. See Tr. 319.

So far, this Court can see no evidence of any substance to support a finding that Ford has the RFC to do even sedentary work, especially in view of the fact that the claimant is without any relevant useful skills. The only evidence that would even arguably enable the Secretary to carry his burden is a form filled out by Dr. Pandit, the consulting physician, called "Medical Assessment of Ability to Do Work-Related Activities (Physical)." This form, Tr. 354–55, says that Ford develops chest pain "with lifting very small loads of less than 15 lbs" or "with walking less than half a block." Tr. 354. His ability to sit is unimpaired, and he can reach, handle, feel, push, and pull. On the other hand, "[a]ny activity that requires exertion physically is likely to aggravate his symptoms of angina," Tr. 355, and "[a]ggravating factors include ... lifting very small loads."

At this point it will be useful to set out the Secretary's definition of sedentary work, the kind of work the Secretary says Ford can do:

*Sedentary work.* Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carring out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567.

It is a considerable stretch, to say the least, to characterize Dr. Pandit's checklist as "substantial evidence" supporting a finding that Ford's physical abilities meet this standard. This is especially true when one recalls that (1) opinions of consulting physicians are traditionally given less weight by the courts than those of treating physicians, and (2) "[t]he RFC that must be found ... is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." *McCoy v. Schweiker,* 683 F.2d 1138, 1147 (8th Cir.1982) (en banc) (footnote omitted). See also *id.* at 1147 n. 8: "as a general rule little weight is afforded to RFC checklists...." But even if the checklist were less equivocal, and even if it could, by itself, amount to substantial evidence, its effect would be fatally undermined by Dr. Pandit's accompanying letter opinion, which leaves no doubt what he thinks of Ford's ability to work. After suggesting that the patient should "undergo further evaluation" (a reference to catheterization of the heart and associated arteries to determine the extent of damage), Dr. Pandit made the following crucial observation (Tr. 353) (emphasis added):

It is possible that, if he has disease that will respond to revascularization [restoration of blood vessels], he will *return* to a condition where gainful employment will be possible.

Dr. Pandit obviously did not believe that Mr. Ford was capable at the time of any "gainful employment." Indeed, it was his view that even if successful surgery should be performed (and no one can say at this

point whether it could be), a return to employable condition would be no more than "possible." It might be argued that the plaintiff has still not established his case, on the ground that his condition, even though perhaps currently disabling, may be remediable through surgery, and surgery cannot be performed because of the patient's own refusal to submit to catheterization, the test that must precede surgery. The answer is that Ford has a good reason for shying away from this intrusive procedure. Apart from the expense (and here the Court accepts *arguendo* the Secretary's position that Ford has enough money to afford the test), Ford expressed a well-founded fear of the possible adverse effects of catheterization:

A   ... Well I have a cousin that died when they was [sic] doin [sic] that thing that they do [sic] your heart.

Q   Catherization? [sic]

A   Yes, Sir....

Tr. 37.

Perhaps most people would choose to undergo the test, but it does have untoward results in a small but appreciable number of cases, and this Court is unwilling to lay down a rule of law that a claimant must submit himself to catheterization of the heart, or be disentitled to disability benefits.

The Court concludes that substantial evidence on the record as a whole does not support the finding of no disability. Mr. Ford is entitled to benefits, with a disability onset date of January 8, 1985, the day he entered the hospital for treatment of his worsening heart disease. Judgment is being entered accordingly.