Linda Darlene MERCER, Plaintiff,

v.

Carolyn W. COLVIN, Acting Commissioner of Social Security, Defendant.

No. 4:13–cv–513 RP–RAW.

United States District Court, S.D. Iowa, Central Division.

Signed Jan. 9, 2015.

Mary C. Luxa, U.S. Attorney's Office, Des Moines, IA, for Defendant.

Gretchen R. Jensen, Schott Mauss & Associates, Des Moines, IA, for Plaintiff.

## MEMORANDUM OPINION AND ORDER

ROBERT W. PRATT, District Judge.

Plaintiff, Linda Darlene Mercer, filed a Complaint in this Court on December 27, 2013, seeking review of the Commissioner's decision to deny her claim for Social Security benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g).

Plaintiff filed an application for benefits July 22, 2010. Tr. at 123–31. Plaintiff, whose date of birth is January 28, 1962, (Tr. at 125) was 50 years old at the time of the hearing on July 3, 2012, before Administrative Law Judge Jo Ann Draper (ALJ). Tr. at 28–63. The ALJ issued a second Notice of Decision—Unfavorable on July 26, 2012. Tr. at 7–22. The Appeals Council declined to review the ALJ's decision on October 18, 2013. Tr. at 1–3. Thereafter, Plaintiff commenced this action.

The ALJ found that Plaintiff was last insured for Title II benefits on December 31, 2011. At the first step of the sequential evaluation, the ALJ found that Plaintiff has not engaged in substantial gainful activity after August 16, 2007, the amended alleged disability onset date. At the second step, the ALJ found Plaintiff has the following severe impairments: obesity; knee osteoarthritis; asthma; histrionic personality disorder; and a somatoform disorder. Tr. at 12. The ALJ found that none of the severe impairments were, alone or in combination, severe enough to qualify for benefits at step three of the sequential evaluation. Tr. at 12–13. At the fourth step, that ALJ found:

> After careful consideration of the entire record, the undersigned finds that through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a), lifting and carrying 10 pounds occasionally and five pounds frequently, standing or walking two hours of an eight hour work day, and sitting six to eight hours of an eight-hour day. Additionally, she may only occasionally climb, balance, stoop, kneel, or crouch, but never crawl or climb ladders, ropes, or scaffolds. Furthermore, the claimant is precluded from exposure to hazards such as heights or moving machinery, and she may only occasionally interact with the public, co-workers, or supervisors. finally, the claimant is precluded from highly detailed, highly complex job tasks.

Tr. at 13–14. The ALJ found that Plaintiff is unable to perform her past relevant work. Tr. at 19. At the fifth step, the ALJ found that Plaintiff is able to do a significant number of jobs, examples of which include pricer, food checker, and

circulation clerk. Tr. at 20–21. The ALJ found that Plaintiff is not disabled nor entitled to the benefits for which she applied. Tr. at 21–22.

## MEDICAL EVIDENCE

On October 17, 2005, Plaintiff was seen by Theodore Lockard, M.D. for an exacerbation of asthma. Tr. at 255–56. Plaintiff's blood pressure was 110/70. Her height was recorded as five feet, five and a half inches, and her weight was 294. Tr. at 255. Plaintiff was given a prescription for Prednisone and instructed to return to the clinic eight days later. Tr. at 256.

Plaintiff returned to the clinic on October 27, 2005 at which time the asthma was noted to be improving. Plaintiff was instructed to taper the dosage of Prednisone and to restart an inhaler. Tr. at 254. Plaintiff's weight was 296. Tr. at 253. On January 16, 2006, Plaintiff saw Dr. Lockard with a dry, hacky cough of "questionable etiology." Tr. at 252.

On January 27, 2006, Plaintiff's cough had improved and Dr. Lockard noted a "history of asthma without evidence of flare-up." The doctor also noted improved control of hypertension. The plan was for Plaintiff to continue working on her diet, exercise and weight loss. Tr. at 250. Plaintiff's weight was 286 pounds. Tr. at 249. On February 24, 2006, Dr. Lockard's assessment was: 1) chronic asthma—moderately good control; 2) chronic diarrhea—status post cholecystectomy; 3) hypertension—adequate control. Tr. at 248. Plaintiff's weight was 280. Tr. at 247.

April 19, 2006, Plaintiff was seen by Michael Fraizer, M.D. at an emergency room because of a 7 to 10 day history of constant left-sided chest pain. The pain had been accompanied by some nausea and shortness of breath. Tr. at 416. Medications included Dilantin, Depakote, Keppra, Hydrochlorothiazide, Norvasc and Benicar. Tr. at 416–17. On physical examination, Plaintiff appeared uncomfortable, but her heart had regular rhythm with no murmurs, gallops or rubs. Electrocardiogram and chest x-rays were normal. Tr. at 417. The doctor opined that Plaintiff's pain was musculoskeletal rather than coronary. Plaintiff was admitted for observation to rule out myocardial infarction. Tr. at 418. See also Tr. at 404–05, which is the discharge summary signed by Philip A. Bear, D.O.

On May 1, 2006, Dr. Lockard saw Plaintiff as a follow up after a hospitalization for chest pain. Plaintiff's weight was 285 pounds and her blood pressure was 144/102. The doctor also addressed the hypertension and superficial phlebitis of the left upper arm. The doctor noted that Plaintiff was working on stress reduction efforts. Consideration was given to counseling at Mercy Franklin. Tr. at 246.

On January 4, 2007, Plaintiff was seen in the Emergency Department of Mercy Hospital complaining of chest pain. Tr. at 290–312. A CT scan did not show evidence of pulmonary embolus. Tr. at 309. A chest x-ray showed mild cardiomegaly without acute cardiopulmonary pathology. Tr. at 310.

Dr. Lockard prescribed a portable nebulizer on January 5, 2007. Tr. at 380.

On March 5, 2007, Plaintiff saw Dr. Lockard with a complaint of difficulty swallowing. She felt as though food was hanging up in her throat. Plaintiff's weight was 300 pounds and her blood pressure was 180/110. Tr. at 487. The doctor diagnosed dysphagia and prescribed a Catapres patch, and Pervacid. The doctor also noted that Plaintiff's blood pressure was out of control and he prescribed medication. Tr. at 488.

On March 14, 2007, Dr. Lockard completed a family member certification of health care provider for the Family and

822

Medical Leave Act. The form was completed on behalf of Plaintiff's husband. The doctor wrote that Plaintiff had a seizure disorder and that she would need assistance from her husband once a week. The doctor said that Plaintiff is unable to care for herself after seizures. Tr. at 375–76. Plaintiff's husband wrote that his wife had seizures as frequently as once a week, or that it could be every two or three weeks. Tr. at 376. Family and Medical Leave Act forms were also filled out February 26, 2009 (Tr. at 502–06) and August 3, 2009 (Tr. at 495–500).

On March 15, 2007, Plaintiff's dysphagia had not improved with medication. Dr. Lockard ordered upper GI encoscopy and possible esophageal dilation. Tr. at 486. Plaintiff's blood pressure was 160/120. Tr. at 485.

On August 16, 2007, Plaintiff saw Dr. Lockard who diagnosed: left arm symptoms—questionable neuropathy; chronic diffuse muscle aches—questionable fibromyalgia; history of seizure disorder; and, questionable history of MS remotely diagnosed. Plaintiff's blood pressure was 164/116 and her weight was 294 pounds. The doctor ordered lab work to follow-up on hypertension and ordered a renal artery doppler to rule out significant stenosis. The doctor said he would consider a consultation with cardiology before pursuing additional blood pressure treatment. Dr. Lockard also wrote: "We'll set up with neurology for EMG's as well as consultation concerning her multiple medical problems of seizure disorder [and] possible MS." Tr. at 483–84.

A study of Plaintiff's kidneys on August 22, 2007, was reported as normal with no evidence for renal artery stenosis. Tr. at 396. On August 23, 2007, Dr. Lockard noted the normal renal artery duplex and normal EMGs of the upper extremities. The doctor wrote: "She apparently has not been taking her seizure medicines at all

and I wonder about compliance with her blood pressure medicines although she states she's still using them." Tr. at 484.

On August 29, 2007, Plaintiff, then 40 years old, saw Michael R.K. Jacoby, M.D. Dr. Lockard asked Dr. Jocoby to evaluate Plaintiff's pain and weakness. Four years earlier, Plaintiff had been involved in a motor vehicle accident after which she developed progressively worsening muscle pain. "At age 18 she flipped her car 'six times' and has been having seizures since. Her last seizure was about 3 weeks ago." Plaintiff reported having two or three seizures per week if not on medication, especially when she is under stress. Plaintiff said that she may go for a period of time without having a seizure. Tr. at 369. Plaintiff's medications included Dilantin, Keppra and Trileptal, which the doctor said were for seizure disorder. Plaintiff's weight was recorded at 291 pounds. After general and neurologic examinations, Dr. Jacoby opined that Plaintiff's pain was due to myofascial syndrome or even fibromyalgia, but that he could not find a neuroanatomic explanation. Tr. at 370.

On October 1, 2007, Dr. Lockard's diagnoses were: Hypertension with noncompliance on medication; chronic seizure disorder; asthma by history without current symptoms although using nebulizer frequently. Plaintiff said she would try to be more regular with her medication. Tr. at 482. Plaintiff's blood pressure was 198/100. Her weight was 291. Tr. at 481.

On October 12, 2007, Plaintiff saw Cory Pittman, M.D. at Mercy Clinics Arthritis and Osteoporosis Center. Plaintiff was described as a 40–year–old woman with joint pain and swelling for four to five years. The doctor wrote:

She says it hurts to bend her hands. It also hurts to wear clothes. It is hard to get up in the morning because of pain and stiffness. She feels needles in her

legs especially the thighs and below her knees. It hurts to have shoes on her feet. She wakes up at night with pain in her legs. She also has pain in the shoulders and left arm, which is occasionally numb. there is occasional pain in the chest, and she did have that checked out in the emergency room and with a stress test, which she was told, was fine. She gets muscle spasms. Her sleep is not restful. Rarely she snores. Sometimes she wakes herself up at night trying to catch her breath and says that this improves with using a breathing treatment for her asthma.

Plaintiff reported being unemployed for two years due to pain. Tr. at 325. The doctor wrote that Plaintiff's last work was customer service, but she had too much pain to sit in the chair for 8 hours a day and had to quit. On physical examination, Plaintiff was noted to be 5 feet, 5 inches tall at a weight of 296.8 pounds—"morbidly obese." X-rays of her knees showed mild medial joint compartment narrowing bilaterally. Tr. at 326. The doctor's impression was: Low back pain likely secondary to degenerative arthritis; knee pain secondary to osteoarthritis and obesity; chronic pain syndrome; and, myalgias and fatigue. The doctor recommended a multidimensional approach to treatment. He first recommended weight loss with diet and exercise. He gave Plaintiff a prescription for water exercise. The doctor said that a sleep study might be needed in the future. The doctor wrote that treatment of depression was critical if she became depressed. The doctor also prescribed medication and recommended topical rubs. Dr. Pittman wrote that physical therapy was ordered to evaluate and treat Plaintiff's knee osteoarthritis and low back pain. Tr. at 327.

Plaintiff saw Dr. Pittman on November 26, 2007. Plaintiff reported feeling about the same with pain in her legs, back and shoulders. On physical examination there

was no synovitis in the joints. Range of motion was full with mild crepitus in the knees. The doctor noted tenderness to palpation over the trapezius and paraspinal muscles in the back and some mild lower back tenderness. Muscle strength was normal. The doctor reviewed the importance of exercise, weight loss and treatment of depression. The doctor recommended using a stationary bicycle as well as water exercises. Tr. at 323. A sleep study was ordered. Tr. at 324.

On February 26, 2008, Plaintiff's blood pressure was 210/110. Tr. at 478. Plaintiff reported a breast lump, so Dr. Lockard ordered a mammogram. The doctor noted that Plaintiff was non-compliant with her blood pressure medication. The doctor discussed the high risk of stroke or heart attack. Plaintiff said she would take her medication as prescribed. On March 7, 2008, Dr. Lockard noted that the mammogram showed a small nodule but not in the area where Plaintiff had noticed a lump. Tr. at 479.

Plaintiff saw Dr. Pittman again on April 4, 2008. The pain was about the same, although it had been worse during the cold months of December and January. Tr. at 321.

Plaintiff saw Dr. Lockard on April 8, 2008 with persistent cough and fevers— probable cough variant asthma. Tr. at 477.

On April 17, 2008, Dr. Pittman wrote to Vanitha Singaram, M.D. The purpose of the letter was to refer Plaintiff for an evaluation of hyperparathyroidism with hypovitaminosis D. The doctor said that Plaintiff's other medical conditions include morbid obesity, low back pain, and osteoarthritis of the knees. Tr. at 320.

Plaintiff saw Dr. Singaram on June 26, 2008. Tr. at 347–52. The doctor noted that Plaintiff had taken 50,000 units of

Vitamin D once a week for three weeks, but she did not follow with a maintenance dose of the vitamin. Plaintiff admitted drinking "a lot of soda" and said that she does not exercise much. The doctor also noted a history of depression as well as hypertension, acid reflux, asthma, arthritis, epilepsy, migraine headaches, miscarriage, and pneumonia. On Review of Systems, Plaintiff complained of fatigue, nosebleeds, dyspnea on exertion, coughing and wheezing, nausea, back pain, joint pain, muscle cramps, muscle weakness, stiffness, arthritis, seizures, headache, cold intolerance, and polydipsia. Tr. at 347–48. After a physical examination, Plaintiff was informed that her vitamin D levels had returned to normal. Tr. at 349.

Plaintiff also saw Dr. Lockard on June 26, 2008. Plaintiff's blood pressure was 188/116. Tr. at 474. The doctor noted that the blood pressure was "uncontrolled with noncompliance on medication." Tr. at 475.

On July 11, 2008, Plaintiff's blood pressure was 118/78, and Dr. Lockard noted the improved control. Tr. at 472–73. On August 29, 2008, Plaintiff complained of right foot swelling which the doctor diagnosed as peripheral edema—probably venous stasis related. The doctor spoke to Plaintiff and her husband about treatment for obesity, and gave her a 1,200 kilocalorie diet to follow. He also advised Plaintiff to keep her legs elevated as much as possible. Tr. at 470–71.

On September 15, 2008, Plaintiff reported that she had started a weight loss program with Dr. Lockard. Dr. Pittman wrote that if she did not lose weight, she would have progressive arthritis. On physical examination, Plaintiff weighed 302 pounds. The doctor wrote that Plaintiff's joint pain was "doing okay on hydrocodone 1 tablet at bedtime." Diagnoses were myofascial pain, chronic pain syndrome; osteoarthritis; morbid obesity; vitamin D

level difficult to replace; and, nonsteroidal anti-inflammatory drug use. The doctor encouraged Plaintiff to engage in water exercise and to use a stationary bicycle. Tr. at 318. The doctor gave Plaintiff a prescription for Skelaxin for her myofascial pain in the trapezius muscles. Tr. at 319.

On January 26, 2009, Plaintiff saw Dr. Lockard complaining of being dizzy. Plaintiff's blood pressure was 86/58. Dr. Lockard diagnosed orthostatic hypertension secondary to dehydration on blood pressure medications. The doctor told Plaintiff to stop taking Lisinopril for a couple days. Tr. at 466–67.

Plaintiff saw Dr. Singaram on February 5, 2009. Tr. at 341–44. Plaintiff's weight was recorded at 303 pounds with a body mass index of 51.39. Tr. at 342. Dr. Singaram's assessment was hyperparathyroidism secondary to vitamin D deficiency, medically complicated obesity, and high risk for diabetes. The doctor ordered a random glucose test which was normal indicating that Plaintiff did not have diabetes. Tr. at 343.

Plaintiff saw Dr. Lockard on April 24, 2009, Plaintiff's blood pressure was 188/124, and her weight was 302 pounds. Plaintiff complained of recurrent headaches which the doctor said were possible migraines. Plaintiff was undergoing treatment for infertility, and some of her medication had been stopped. Tr. at 464–65. On May 1, 2009, Plaintiff was back on her medication and blood pressure was 130/88. Tr. at 462–63.

On August 18, 2009, Plaintiff was seen by a physical therapist with complaints of flank pain. Plaintiff reported that she had undergone 60 to 75 chiropractic treatments over a two year period which did not alleviate her symptoms. Plaintiff was issued a TENS unit for general pain control. Treatment plan included upper extremity

flexibility, general conditioning, range of motion and stabilization exercises. The plan called for Plaintiff to be seen 2–3 times per week for four weeks. Tr. at 336. On September 27, 2009, the physical therapist noted that Plaintiff had not returned for physical therapy so she was discharged from his care. Tr. at 335.

On August 19, 2009, Plaintiff saw Dr. Lockard complaining of right sided low back pain. Her blood pressure was 179/120. The doctor said he would order physical therapy and he encouraged Plaintiff to take her medications regularly. Tr. at 459–60.

On October 27, 2009, Plaintiff saw Wayne C. Belling, D.O., for respiratory illness. Tr. at 458.

On December 3, 2009, Plaintiff reported that she was no longer attempting pregnancy. She had been off her medication for a week, and her blood pressure was 220/120. Dr. Lockard wrote: "She asked about disability and we'll have her check with Social Security as to whether she would qualify for that." Tr. at 455–56.

On January 21, 2010, Plaintiff went to Dr. Lockard after she fell on her right hip. Her blood pressure was 180/140. The doctor diagnosed a low back strain and prescribed Lortab for pain. Plaintiff was told to use ice on her back for the next 48 hours, and to do stretching exercises and to walk. The doctor discussed the need for regular dosing of her blood pressure medication. Tr. at 453–54.

On February 4, 2010, Plaintiff was seen at Dr. Lockard's clinic complaining of left arm pain that radiated to the neck and into the breast. It does not appear she saw Dr. Lockard on that occasion. Tr. at 452.

On February 4, 2010, Plaintiff saw David W. McAllister, D.O., at the Iowa Heart Center. Plaintiff complained of left chest and arm pain with dyspnea on exertion. Plaintiff's history of asthma and fibromyal-gia were noted. Tr. at 412. The doctor ordered a Regadenoson Cardiolite test to rule out ischemia. The doctor added atenolol for treatment of Plaintiff's hypertension and he stopped the medication methyldopa. The doctor also ordered an echocardiogram. Tr. at 414. A chest x-ray dated February 4, 2010, showed that Plaintiff heart was mildly enlarged without perihilar edema or pleural fluid. A calcified granuloma was noted in the left lung base. Tr. at 392. On February 10, 2010, Plaintiff underwent tomographic rest imaging as ordered by Dr. McAllister. The study did not show infarct or ischemia. Tr. at 389–90. Plaintiff also underwent an echocardiogram on February 10, 2010. The results were noted to be normal. Tr. at 384–85. Plaintiff saw Dr. McAllister on February 18, 2010, at which time he opined that Plaintiff's chest pain was "most likely not cardiac in origin, I would suspect her fibromyalgia." Tr. at 406–08.

On February 18, 2010, Plaintiff saw Dr. Lockard for a probable viral upper respiratory infection. Dr. Lockard was aware of the changes Dr. McAllister had made to Plaintiff's blood pressure medication. Plaintiff's blood pressure was 156/76. Tr. at 450–51. Plaintiff also saw Dr. McAllister on February 18, 2010. Dr. McAllister noted that testing was negative for ischemia and that an echocardiogram was normal. Tr. at 544. Dr. McAllister wrote that he suspected that Plaintiff's chest pain was due to fibromyalgia. He increased the dosage of one of Plaintiff's blood pressure medications. Tr. at 545.

On March 25, 2010, Plaintiff saw Dr. McAllister. Plaintiff's chest pain had resolved, but her hypertension was not optimally controlled so the doctor added amlodipine to Plaintiff's medication. Tr. at 409–11.

On April 27, 2010, Plaintiff saw Dr. Lockard for an upper respiratory infection.

Her blood pressure was 170/92, and the doctor noted that the systolic (upper number) was elevated. Tr. at 448–49.

Plaintiff was admitted to Mercy Medical Center West Lakes April 28, 2010 and discharged on the 29th. Tr. at 332–43. Earlier in the day, Plaintiff had been to her primary care clinic where she had seen Tamra Richardson–Colby, D.O. with complaints of upper respiratory symptoms, acute onset chest pressure with radiation to her arm (see Tr. at 446–47). Plaintiff's blood pressure was 180/102 and she had a fever. Plaintiff was sent to the hospital to rule out myocardial infarction and for evaluation of the fever. Tr. at 434. The discharge summary lists a principal diagnosis of atypical chest pain. Tr. at 443.

On May 26, 2010, Plaintiff saw Dr. Lockard who noted that cardiac disease had been ruled out during the recent hospitalization. The doctor diagnosed chronic fibromyalgia with continued right low back pain, musculoskeletal in nature. Plaintiff was told to begin using the TENS unit again and encouraged to engage in regular exercise with walking and stretching exercises as instructed when she underwent physical therapy. The doctor noted that Plaintiff's blood pressure "looks significantly better than it ever has in the past." The blood pressure was recorded at 116/82. Plaintiff was encouraged to continue taking her medication. The doctor wrote: "I suspect a lot of her high blood pressure readings in the past have been more noncompliance with medication and strongly encouraged her to be more regular with these to maintain better blood pressure control." Tr. at 444–45. See also Tr. at 515 which is a letter from Dr. Lockard to Dr. McAllister regarding the visit on May 26, 2010.

Plaintiff saw Dr. Richardson–Colby on October 26, 2010. Plaintiff's husband told the doctor that Plaintiff sometimes forgets to take all the doses of the blood pressure medication, and asked if there was an option for a single dose rather than several throughout the day. Plaintiff said that in spite of taking Cymbalta, she continued to have pain in her joints. She also complained of depression and fibromyalgia. The doctor adjusted the high blood pressure medication and increased the dosage of Cymbalta. At her request, Plaintiff was given a handicap parking pass. Tr. at 558.

On December 8, 2010, Plaintiff saw Arthur H. Konar, Ph.D. for a consultative examination. Tr. at 564–69. Dr. Konar reviewed medical records which showed a diagnosis of chronic fibromyalgia, hypertension and a history of asthma and seizure disorder. Tr. at 564. Plaintiff told the doctor that the main reason she was applying for disability was fibromyalgia. She said that her muscles feel as though they are on fire. Plaintiff reported that she completed the 8th grade and left school when she was 16 years old. Plaintiff said that the medication Cymbalta was prescribed for fibromyalgia, and Plaintiff did not admit to having depression. However, Dr. Konar wrote: "Yet, this does not mean that psychological issues are not going on with this claimant ..." On diagnostic interview, Plaintiff reported that her first marriage of 25 years was "very abusive ... he beat me all the time." The doctor found it amazing and somewhat unbelievable that "the only people who are aware of this situation are her pastor, her current husband and [herself]." Tr. at 565. The doctor noted that in spite of Plaintiff's history, she denied feelings or clinical symptoms of depression or anxiety. The doctor continued: "Ms. Mercer actually operates with a significant amount of psychological denial. In fact, it is believed that much of her psychological trauma is manifested through somatic complaints." Plaintiff stated that she is suppose to be taking medication for high blood pressure, but does not. Dr. Konar wrote that Plain-

tiff's report of inability to do daily functions appeared to be out of wack with reality. For example, Plaintiff said she was unable to comb her hair and was completely impaired in her range of motion. "She said that she is in so much pain that she 'can't get a hug.'" Under the heading Behavioral Observations, Dr. Konar wrote:

> Ms. Mercer is an obese, married woman who dresses in a very conservative manner that almost gives her an Amish appearance. She looks much older than her 48 years and she appears to be very passive in her approach to life. Her appearance and posture belie a life of being supplicant to others and expressing her needs in an indirect manner and through various defense mechanisms. She appears to be on the verge of tears most of the time, though does not cry. She walks with NO limp and her face does not suggest pain in her sitting or standing.

On mental status evaluation, Plaintiff provided marginal effort. Memory functions were adequate but somewhat weak. Verbal reasoning was mostly elementary and showed limited ability to employ abstract thinking. Tr. at 566. Plaintiff initially denied any head trauma, but then told the doctor of the car accident at age 18 or 19. The doctor wrote that cognitive and concentration loses were apparent in the mental status exam and that further testing would be needed to substantiate them. The doctor wrote that Plaintiff's medical problems, while they have a basis in reality, "may take on a heightened and unrealistic disability and her ability to cope with pain and discomfort are severely diminished." The doctor continued:

> Yet, more importantly she appears to qualify for a Histrionic Personality disorder with dependent features. Ms. Mercer has a history of fabricating and exaggerating her difficulties. She is uncomfortable not being the center of attention, she can be inappropriate and is historically labile with her heterosexual relationships, she has rapidly shifting and shallow emotional expression, her appearance attempts to draw attention to herself, she is highly melodramatic, and she manipulates relationships. She expresses little to no insight and has managed to be taken care of by the system. Her manifest problem solving is much lower than her general intelligence.

Dr. Konar opined that Plaintiff is not consciously aware of much of her disorder, although "she is clearly not beyond attaining secondary gain for her circumstances." On Axis I, the doctor diagnosed undifferentiated somatoform disorder (provisional), and cognitive disorder, NOS—acquired cognitive impairments. The Axis II diagnosis was histrionic personality disorder with dependent personality features. Tr. at 567. Dr. Konar wrote:

> Ms. Mercer has no long term history of depression or high anxiety. Her history would indicate that she has been low functioning for a period of time. If her rendition of her 25 year marriage is to be taken at face value she is/should be a traumatized woman. Yet, she is a person of very little psychological sophistication and uses denial and somatization as her primary defense mechanisms to psychological trauma. Thus, she is not operating anywhere near her potential, though her weak functioning is likely mostly unconscious in nature.

In response to the referral questions, the doctor opined that Plaintiff's is cognitively able to remember and understand instructions, procedures and locations; Plaintiff is mostly cognitively able to carry out instructions, maintain attention, concentration and locations, but her mental illness and personality disorder may sabotage her efforts; Plaintiff in not able to interact

appropriately with supervisors, co-workers and the public, "She is a highly passive and dependent woman"; Plaintiff is not able to use good judgment and respond appropriately to changes in the work place, "She has low insight and is a highly passive and dependent woman". Tr. at 568.

In correspondence between Dr. Richardson–Colby and Plaintiff's insurance company dated December 22, 2010 (Tr. at 611–16), regarding Plaintiff's hypertension, the doctor indicated that Plaintiff was non-compliant with her medication. Tr. at 614.

Plaintiff saw Dr. Richardson–Colby on January 4, 2011. Plaintiff's blood pressure was 150/90, and her weight was recorded at 301 pounds. The diagnoses were uncontrolled hypertension, fibromyalgia, depression, decreased vitamin D and low back pain with right leg radiculopathy. The doctor ordered an MRI of the lumbar spine. Tr. at 605. The MRI was of limited quality because of Plaintiff's obesity, but it showed a slight progression of moderate disc degeneration at L5–S1. Tr. at 610. On February 3, 2011, Plaintiff's blood pressure was 156/90 and her weight was 301 pounds. Tr. at 604. On April 1, 2011, Plaintiff complained of dizziness after taking her medication. Tr. at 637. On April 15, 2011, Plaintiff complained of left arm pain and said that the left side of her chest felt "puffy". Tr. at 636. Plaintiff saw Dr. Richardson–Colby on April 22, 2011. Plaintiff said that she had pain when trying to lift her left arm. The diagnosis was left pectoralis strain. The doctor scheduled Plaintiff to be seen by physical therapy later that day. In addition, the doctor noted that Plaintiff, while not diabetic, was glucose intolerant and Plaintiff was given a prescription for Metformin. Tr. at 635.

On July 5, 2011, Plaintiff saw Dr. Richardson–Colby. Plaintiff had been to the emergency room the day before because she tripped and fell injuring her right arm and elbow. Plaintiff also had a nose bleed after which she experienced syncope. The doctor examined x-rays of Plaintiff's right elbow and placed Plaintiff in a sling for two weeks. Plaintiff's blood pressure was 186/102, and Plaintiff admitted she was not taking one of her medications. The doctor counseled Plaintiff that she needed to take responsibility for her health care. The doctor discussed the concern for a heart attack or stroke if the blood pressure continued to be high. Tr. at 633. When Plaintiff was seen for a re-check of her arm, on July 12, 2011, her blood pressure was 148/92 which the doctor noted was markedly better than on the previous occasion. Plaintiff mentioned that she was going camping that evening with her grandchildren. The dosage of Plaintiff's blood pressure medication was increased. Tr. at 631. On July 23, 2011, Plaintiff blood pressure was 122/88 and her weight was 296 pounds. Tr. at 629. On August 5, 2011, Plaintiff's blood pressure was 124/70 and her weight was 295. Tr. at 628.

On October 24, 2011, Plaintiff saw Dr. Richardson–Colby. Plaintiff reported doing well with her blood pressure control. Plaintiff denied impaired vision, dyspnea, chest pain, intermittent leg claudication or lower extremity edema. Plaintiff was noted to be taking her medications as directed. Tr. at 625. Plaintiff's blood pressure was 120/70 and her body mass index was 51.98.

On November 18, 2011, Plaintiff reported not doing well with blood pressure control. Plaintiff said she was adherent with her medication and she denied side effects. Tr. at 622. On physical exam, her blood pressure was 130/88, and her body mass index was 51.6. Tr. at 623. When Plaintiff was seen on December 14, 2011, by Anna Dammann, CMA, at Mercy Family Medicine of Urbandale, her blood pressure was 116/72. Tr. at 643.

On January 16, 2012, Plaintiff saw Dr. Richardson–Colby for a physical examination. Tr. at 638–42. On Review of Systems, Plaintiff complained of dizziness, but no vertigo. Plaintiff did not complain of chest discomfort, and there was no extremity swelling or varicose veins. Tr. at 639. There was no arthralgia, myalgia, muscle cramps, back pain, joint swelling or stiffness and no limb pain. Plaintiff's blood pressure was 130/80, and it was noted that she was compliant with her blood pressure medication. Plaintiff's weight was noted to be 314 pounds with a body mass index of 52.32. On physical exam, other than a yeast rash on a portion of the skin, it does not appear that there were any significant abnormalities observed by the doctor. Tr. at 640. Diagnoses were hypertension, obesity and vitamin D deficiency. Tr. at 641.

On May 21, 2012, Plaintiff was admitted to Mercy Hospital Medical Center and discharged the next day. Tr. at 677–745. On the morning of admission, Plaintiff was awaken from sleep by chest pain with radiation to the left shoulder. Tr. at 679. A chest x-ray was negative and an electrocardiogram showed normal sinus rhythm and an age undetermined septal infarct. Tr. at 681. A treadmill was "felt to be negative for ischemia, but non-diagnostic for failure to achieve target heart rate." Tr. at 720. A PET/CT scan was also negative for ischemia. Tr. at 737.

On June 15, 2012, Plaintiff saw Dr. Richardson–Colby. Tr. at 673–76. The doctor noted that Plaintiff's blood pressure was stable and that she was taking her medication as prescribed. Tr. at 673. Plaintiff's weight was recorded at 320 pounds with a body mass index of 53.31. Tr. at 675. The doctor also filled out a residual functional capacity questionnaire. The doctor agreed that Plaintiff would be limited to lifting 20 pounds occasionally, and 10 pounds frequently. The doctor opined

that Plaintiff would be limited to less than 3 hours of walking and standing, but that she could sit up to six hours per day. The doctor said that because of upper extremity neuropathy, Plaintiff is seldom able to reach, handle, finger and feel. Tr. at 671. The doctor opined that if Plaintiff were to work, the job would need to be sedentary and allow for multiple breaks and that she could not work longer than 4 hours continuously due to pain. Tr. at 672.

## ADMINISTRATIVE HEARING AND DECISION

Plaintiff appeared with counsel at the hearing on July 3, 2012. Tr. at 28–63. Although Plaintiff knew her date of birth, she was convinced that she had turned 49 years old on her birthday the previous January. Tr. at 34–35. Plaintiff said she had stopped working in 2006, because she was unable to sit at a desk all day long because of pain. Tr. at 35. She said that the job did not allow her to get up and move around to relieve the pain. Tr. at 36.

Plaintiff testified that she must elevate her feet to relieve swelling in her legs. She said that she lies down with her feet propped up on a wedge shaped board. Tr. at 37. Plaintiff said that fibromyalgia causes pain through her shoulders and down into the back and legs. Plaintiff said that pain in her hands and fingers interferes with typing or holding cooking utensils. Tr. at 39. Plaintiff said that her medications make her sleepy and that she sleeps most afternoons. Tr. at 43. Plaintiff testified that two or three times per week, she gets a migraine headache for which she takes over the counter medication and sleeps in a dark room until they pass. Plaintiff said that she spends 50 percent of her day sitting in a recliner with her feet elevated. Tr. at 44.

After Plaintiff testified, the ALJ called Julie Speck to testify as a vocational ex-

pert. Tr. at 53. The ALJ asked the following hypothetical question:

Okay. Ms. Speck, could you please assume a hypothetical individual. This hypothetical individual starts out as a younger individual. Currently, this individual would be closely approaching advanced age with a limited education and past work history that would be consistent with the two jobs that you've identified on the past work summary form that is exhibited as Exhibit 18–E in this file (Tr. at 244, customer service worker and retail manager). Now, this first hypothetical individual, who has the same vocational profile as the claimant, is limited to lifting and carrying no more than 10 pounds occasionally, five pounds frequently, standing and walking is limited to approximately two hours a day, sitting anywhere from six to eight hours a day.

This individual can only occasionally climb, balance, stoop, kneel, crouch, but can never climb ropes, ladders or scaffolds, and this individual should have no exposure to hazardous working conditions, such as working around heights or moving machinery. Now, this hypothetical individual is precluded from performing past work. Now, this individual is precluded from performing highly-detailed, highly-complex job tasks, would not be precluded from more moderately-detailed or moderately-complex work, and this individual should have occasional interaction with public coworkers and supervisors.

Now let me just stop there to start with. Could this first hypothetical individual perform any work that's been performed within the last 15 years?

Tr. at 58–59. The vocational expert responded negatively. Tr. at 59. The vocational expert testified that Plaintiff obtained skills from her past work which, under the restrictions in the hypothetical, would transfer to jobs such as sedentary, semiskilled jobs such as delivery pricer, food checker, and circulation clerk. The vocational expert testified that the jobs could be performed by someone who needed to rise from a seated position approximately every 30 to 45 minutes for two to three minutes. Tr. at 60. The vocational expert testified that if the hypothetical individual should avoid constant reaching, handling, fingering and feeling bilaterally, the jobs could not be performed, nor could she identify any other available jobs to which there would be transferable skills. The vocational expert went on to testify that the need to elevate the feet, either above heart level or at 90 degrees, would exceed what an employer would tolerate. Tr. at 61. The vocational expert also testified that an individual who is absent from work three or more times a month is precluded from work activity. Tr. at 62.

In her decision, the ALJ discounted much of the evidence of Plaintiff's disability because: "According to ... [Dr. Konar] the claimant has a tendency to exaggerate her difficulties and she is highly melodramatic." Tr. at 17. The ALJ discounted Dr. Konar's opinion regarding her compromised ability to interact appropriately with others because Plaintiff had worked at a church library, and went camping with her grandchildren on at least one occasion, and because she attends church once a week. "These activities indicate that despite her personality and somatoform disorders, she is only moderately limited socially, and she still maintains the ability to interact with others on at least an occasional basis." Tr. at 18.

The ALJ discounted the opinion of Dr. Richardson–Colby that Plaintiff would only be able to work four hours per day, because:

... Dr. Richardson–Colby finds the claimant's subjective complaints credible, and undoubtedly bases that opinion

on [Plaintiff's reports of pain]. As previously discussed, though, and noted in Dr. Konar's report, the claimant has a tendency to overstate her symptoms, imposing greater limitations upon herself than otherwise indicated by the medical evidence.

Tr. at 19.

## DISCUSSION

We will affirm the ALJ's decision "[i]f the ALJ's findings are supported by substantial evidence on the record as a whole," an inquiry that requires us to consider evidence in the record that detracts from the ALJ's decision. *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the decision." *Reutter ex rel. Reutter v. Barnhart*, 372 F.3d 946, 950 (8th Cir.2004).

We will not reverse the ALJ's "denial of benefits so long as the ALJ's decision falls within the 'available zone of choice.'" *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir.2008). The decision of the ALJ "is not outside the 'zone of choice' simply because we might have reached a different conclusion had we been the initial finder of fact." *Id.* (quoting *Nicola*, 480 F.3d at 886). Rather, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir.2005). *Owen v. Astrue*, 551 F.3d 792, 798 (8th Cir.2008.) In *Brand v. Secretary of Dept. of Health, Education and Welfare*, 623 F.2d 523, 527 (8th Cir.1980), Chief Judge Lay wrote that *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951) is "the guideline for the evaluation of the standard of review. In *Universal Camera*, the Court wrote:

> We conclude, therefore, that the Administrative Procedure Act and the Taft–Hartley Act direct that courts must now assume more responsibility for the reasonableness and fairness of Labor Board decisions than some courts have shown in the past. Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function. Congress has imposed on them responsibility for assuring that the Board keeps within reasonable grounds. That responsibility is not less real because it is limited to enforcing the requirement that evidence appear substantial when viewed, on the record as a whole, by courts invested with the authority and enjoying the prestige of the Courts of Appeals. The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both.

*Id.*, 340 U.S. at 490, 71 S.Ct. 456. In reviewing disability decisions from the Social Security Administration, the Court sits in an appellate capacity and is responsible for giving the agency decision a scrutinizing analysis. This requires the Court to determine the substantiality of the evidence by determining if the ultimate decision is supported by substantial evidence on the record as a whole. *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir.1987).

In this case, the ALJ found that Plaintiff's severe impairments are obesity, knee osteoarthritis, asthma, histrionic personality disorder, and a somatoform disorder. Obesity is the first impairment on the list, and possibly Plaintiff's most serious im-

pairment. Plaintiff is five feet, five and a half inches tall. Her weight has always been recorded close to or above 300 pounds. Whenever her body mass index was calculated it was above 50. The medical records indicate that her weight increased during the pendency of her claim from 280 pounds to 320 pounds. *See* Tr. at 247 and 675.

The evaluation of obesity is governed by Social Security Ruling (SSR) 02–1p, 2002 WL 34686281. Social Security Rulings are "binding on all components of the Social Security Administration." *Grebenick v. Chater,* 121 F.3d 1193, 1200 (8th Cir.1997) quoting 20 C.F.R. § 422.406(b)(1) (1996). The SSR explains that prior to October 25, 1999, obesity was a listed impairment. Before that date, an individual could have been found disabled due to obesity at the third step of the sequential evaluation when the appropriate criteria were evident in the medical record. The obesity listing was eliminated because it was determined that the criteria did not represent a degree of functional limitation that would prevent an individual from engaging in substantial gainful activity. SSR 02–1, 2002 WL 34686281 at *1. Nevertheless, the SSR makes it clear that obesity must be considered in combination with other impairments at the third, fourth and fifth steps of the sequential evaluation, because "... the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately." *Id.*

In answer to the question, "what is obesity?", the SSR states: "Obesity is a complex, chronic disease characterized by excessive accumulation of body fat. Obesity is generally the result of a combination of factors (e.g., genetic, environmental, and behavioral)." *Id.* at *2. The SSR states that the National Institutes of Health (NIH) established medical criteria for the diagnosis of obesity. "These guidelines classify overweight and obesity in adults according to Body Mass Index (BMI). BMI is the ratio of an individual's weight in kilograms to the square of his or her height in meters (kg/m$^2$)." *Id.* A BMI above 30 is diagnosed as obesity. "The Clinical guidelines recognize three levels of obesity. Level I includes BMIs of 30.0–304.9. Level II includes BMIs of 35.0–39.9. Level III, termed "extreme" obesity and representing the greatest risk for developing obesity-related impairments, includes BMIs greater than or equal to 40. These levels describe the extent of obesity, but they do not correlate with any specific degree of functional loss." *Id.* The SSR explains that obesity increases an individual's chances of developing impairments in many body systems. "Obesity may also cause or contribute to mental impairments such as depression. The effects of obesity may be subtle, such as the loss of mental clarity and slowed reactions that may result from obesity-related sleep apnea." *Id.* at *3. Although obesity is no longer a listed impairment, "... we may find that the obesity medically equals a listing." *Id.* at *4.

Because there is no listing for obesity, we will find that an individual with obesity 'meets' the requirements of a listing if he or she has another impairment that, by itself, meets the requirements of a listing. We will also find that a listing is met if there is an impairment that, in combination with obesity, meets the requirements of a listing. For example, obesity may increase the severity of coexisting or related impairments to the extent that the combination of impairments meets the requirements of a listing. This is especially true of musculoskeletal, respiratory, and cardiovascular impairments. It may also be true for other coexisting or related impairments, including mental impairments.

*Id.* at *5. As an example, the SSR states that obesity is a second impairment to meet or equal the requirements of 12.05C. Obesity, by itself, may medically equal a listed impairment:

> For example, if the obesity is of such a level that it results in an inability to ambulate effectively, as defined in sections 1.00B2b or 101.00B2b of the listings, it may substitute for the major dysfunction of a joint(s) due to any cause (and its associated criteria), with the involvement of one major peripheral weight-bearing joint in listings 1.02A or 101.02A, and we will then make a finding of medical equivalence ...

*Id.* The SSR goes on

> We will also find equivalence if an individual has multiple impairments, including obesity, no one of which meets or equals the requirements of a listing, but the combination of impairments is equivalent in severity to a listed impairment. For example, obesity affects the cardiovascular and respiratory systems because of the increased workload the additional body mass places on these systems. Obesity makes it harder for the chest and lungs to expand. This means that the respiratory system must work harder to provide needed oxygen. This in turn makes the heart work harder to pump blood to carry oxygen to the body. Because the body is working harder at rest, its ability to perform additional work is less than would otherwise be expected. Thus, we may find that the combination of a pulmonary or cardiovascular impairment and obesity has signs, symptoms, and laboratory findings that are of equal medical significance to one of the respiratory or cardiovascular listings.

*Id.* Obesity must also be considered at steps four and five of the sequential evaluation because of its effect on the ability to do exertional activities such as sitting, standing, walking, lifting, carrying, pushing, and pulling. "The ability to manipulate may be affected by the presence of adipose (fatty) tissue in the hands and fingers." *Id.* at *6. The SSR states that the effects of obesity may not be obvious, for example because sleep apnea may lead to drowsiness and lack of mental clarity. In addition: "Obesity may also affect an individual's social functioning."

■ Although obesity was noted to be a severe impairment at step two of the sequential evaluation, the ALJ did not obtain medical evidence to properly determine its effect on Plaintiff's health and her ability to function as mandated by the above quoted SSR. This, in itself, would require a remand to fully and fairly develop the record on this point. However, consideration must also be given to Plaintiff's mental impairments—personality disorder and somatoform disorder—which the ALJ also found to be severe impairments at step two of the sequential evaluation.

Dr. Konar was asked to evaluate Plaintiff's mental status and to respond to specific questions regarding her ability to function in the work place. Dr. Konar's diagnoses were undifferentiated somatoform disorder (provisional), and cognitive disorder, NOS—acquired cognitive impairments, histrionic personality disorder with dependent personality features. Although Plaintiff did not complain of symptoms of mental illness, Dr. Konar opined that psychological factors are an important component of Plaintiff's inability to work. The doctor also made it clear that Plaintiff has very little, if any, insight into her mental health status.

As noted above, Dr. Konar was asked by the Commissioner's State Agency to use his expertise to offer an opinion regarding Plaintiff's ability to function in competitive work. It was the doctor's opinion that Plaintiff is cognitively able to remember

and understand instructions, procedures and locations, as well as to carry out the same. However, it was the doctor's professional opinion that Plaintiff's mental illness and personality disorder may sabotage her efforts. Specifically, the doctor said Plaintiff is not able to interact appropriately with supervisors, co-workers and the public, "She is a highly passive and dependent woman". Likewise, Plaintiff is not able to use good judgment and respond appropriately to changes in the work place, "She has low insight and is a highly passive and dependent woman".

In *Easter v. Bowen*, 867 F.2d 1128 (8th Cir.1989), Easter was diagnosed with a somatoform disorder. The Court wrote: "This mental disturbance causes her to believe that her physical ailments are more serious than the clinical data would suggest." *Id.* at 1129. The Court pointed out that the *Diagnostic and Statistical Manual of Mental Disorders* (Third Edition), states that the disorder is not under the patient's voluntary control. *Id.* Likewise, in the case at bar, Dr. Konar made it clear that Plaintiff has very little sophistication, and is not aware that she deals with psychological difficulties by experiencing physical illness.

In *Easter*, the Court wrote:

[A]n applicant need not be completely bedridden or unable to perform any household chores to be considered disabled. See *Yawitz v. Weinberger*, 498 F.2d 956, 960 (8th Cir.1974). What counts is the ability to perform as required on a daily basis in the "sometimes competitive and stressful" environment of the working world. *Douglas v. Bowen*, 836 F.2d 392, 396 (8th Cir.1987) (quoting *McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir.1982) (en banc)).

*Id.* at 1130. Very much like the case law, the SSR states: "[O]ur RFC assessments must consider an individual's maximum remaining ability to do sustained work activi-

ties in an ordinary work setting on a regular and continuing basis ... 8 hours a day, for 5 days a week ..." SSR 02–1, 2002 WL 34686281 at *6.

In the case at bar, Plaintiff is a woman who has been diagnosed as morbidly obese, with a body mass index 50 or higher. She has also been diagnosed with psychological illnesses. The ALJ found Plaintiff's severe impairments to be obesity, knee osteoarthritis, asthma, histrionic personality disorder, and a somatoform disorder. The ALJ rejected the uncontradicted opinion of Plaintiff's treating physician because Dr. Konar opined that Plaintiff exaggerates her symptoms. This is the very nature of a somatoform disorder. In *Easter*, the ALJ rejected testimony regarding limited use of the claimant's hands because none of the allegations found support in the medical evidence. The Court wrote:

Once again, the ALJ gives insufficient weight to Mrs. Easter's somatoform disorder, and focuses unduly on the objective physical data. Without expressly finding Mrs. Easter's testimony not credible, the ALJ is not free to reject her subjective experiences in this way, particularly since she has a diagnosed mental disorder that causes a distorted perception of her physical ailments. To do so is directly contrary to the spirit of *Polaski v. Heckler*, 739 F.2d 1320 (order), *supplemented*, 751 F.2d 943 (8th Cir.1984), *vacated*, 476 U.S. 1167, 106 S.Ct. 2885, 90 L.Ed.2d 974 (1986), *adhered to on remand*, 804 F.2d 456 (8th Cir.1986), *cert. denied*, 482 U.S. 927, 107 S.Ct. 3211, 96 L.Ed.2d 698 (1887).

*Easter v. Bowen*, 867 F.2d at 1131. The Court concluded it's opinion by stating: "In reviewing administrative decision, it is the duty of the Court to evaluate all of the evidence in the record, taking into account whatever in the record fairly detracts from the ALJ's decision. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct.

456, 464–65, 95 L.Ed. 456 (1951); *Piercy v. Bowen*, 835 F.2d 190, 191 (8th Cir.1987)." *Id.*

■ By failing to find that Plaintiff's impairments are medically equivalent to one or more listed impairments at step three of the sequential evaluation, the ALJ committed reversible error. The evidence in this case is clear that Plaintiff's obesity, combined with her other severe impairments are equal in severity to section 12.07 somatoform disorders and/or section 12.08 personality disorders. "If the claimant wins at the third step (a listed impairment), she must be held disabled, and the case is over." *Maresh v. Barnhart*, 438 F.3d 897, 901 (8th Cir.2006), quoting *Jones v. Barnhart*, 335 F.3d 697, 699 (8th Cir. 2003).

■ In the alternative, at steps four and five of the sequential evaluation, there is no medical evidence which supports a finding that Plaintiff has the residual functional capacity to work day in and day out in the competitive and stressful conditions in which real people work in the real world. *See, e.g. Lauer v. Apfel*, 245 F.3d 700, 703–04 (8th Cir.2001) in which the Court wrote:

> Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence," *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir.2000), we have also stated that a "claimant's residual functional capacity is a medical question." *Singh [v. Apfel]*, 222 F.3d [448] at 451 [ (8th Cir.2000) ]. "[S]ome medical evidence," *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir.2000) (per curiam), must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace," *Nevland v. Apfel*, 204 F.3d

853, 858 (8th Cir.2000).... [A]lthough in evaluating Mr. Lauer's RFC, *see* 20 C.F.R. § 404.1545(c), the ALJ was not limited to considering medical evidence, we believe that the ALJ was required to · consider at least some supporting evidence from a professional. *Cf. Ford v. Secretary of Health and Human Services*, 662 F.Supp. 954 (W.D.Ark.1987) (RFC was "medical question," *Id.* at 955, and medical evidence was required to establish how claimant's heart attacks affected his RFC, *Id.* at 956) cited with approval in *Nevland*, 204 F.3d at 858.

■ In this case, Plaintiff has proved her disability by medical evidence and is entitled to the benefits for which she applied. A remand for anything other than to calculate the amount of benefits would accomplish nothing other than a delay the receipt of benefits to which she is entitled.

## CONCLUSION AND DECISION

The Court has considered the evidence which supports, as well as the evidence which detracts from the decision made by the ALJ. After applying the balancing test noted in *Gavin v. Heckler*, 811 F.2d at 1199 (8th Cir.1987), and cases cited therein, this Court holds that the final decision of the Commissioner is not supported by substantial evidence on the record as a whole. This case is reversed and remanded for a computation of the benefits to which Plaintiff is entitled.

The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See also, McDannel v. Apfel*, 78 F.Supp.2d 944 (S.D.Iowa 1999) (discussing, among other things, the relationship between the EAJA and fees under 42 U.S.C. § 406(b), and LR 54.2(b)).[1] *See*

---

1. N.B. Counsel is reminded that LR 54.2(b), states that an EAJA application "must specifi-

cally identify the positions taken by the gov-

*also, Gisbrecht v. Barnhart,* 535 U.S. 789, 122 S.Ct. 1817, 1821, 152 L.Ed.2d 996 (2002); *Mitchell v. Barnhart,* 376 F.Supp.2d 916 (S.D.Iowa 2005).

IT IS SO ORDERED.

ernment in the case that the applicant alleges    were not substantially justified.''