Dulcie Renee OSSMANN, Plaintiff,

v.

Carolyn W. COLVIN, Acting Commissioner of Social Security, Defendant.

3:15-cv-98 RP-HCA

United States District Court, S.D. Iowa, Davenport Division.

Signed 06/15/2016

Robert J. Engler, Robberts, Kirkman & Engler, L.L.L.P., Burlington, IA, for Plaintiff.

Mary C. Luxa, United States Attorney's Office, Des Moines, IA, for Defendant.

## MEMORANDUM OPINION AND ORDER

ROBERT W. PRATT, Judge, UNITED STATES DISTRICT COURT

Plaintiff, Dulcie Renee Ossmann, filed a Complaint in this Court on August 28, 2015, seeking review of the Commissioner's decision to deny her claim for Social Security benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et*

*seq.* This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g).

Plaintiff filed an application for benefits on July 13, 2012. Tr. at 126-31. Plaintiff, whose date of birth is August 5, 1973 (Tr. at 126), was 40 years old at the time of the hearing on December 17, 2013, before Administrative Law Judge John M. Wood (ALJ). Tr. at 30-51. The ALJ issued a Notice Of Decision—Unfavorable on March 31, 2014. Tr. at 11-24. The Appeals Council declined to review the ALJ's decision on July 1, 2015. Tr. at 1-4. Thereafter, Plaintiff commenced this action.

At the first step of the sequential evaluation (20 C.F.R. § 404.1520(a)(4)), the ALJ found that Plaintiff has not engaged in substantial gainful activity after the date of her application for benefits. At the second step, the ALJ found Plaintiff has the following severe impairments: rheumatoid arthritis, fibromyalgia, obesity, and a degenerative back disorder. The ALJ found that Plaintiff's impairments were not severe enough to qualify for benefits at the third step of the sequential evaluation. Tr. at 16. At the fourth step, that ALJ found:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except: the claimant cannot climb ladders, ropes, scaffolds; the claimant can perform other postural functions occasionally; the claimant needs a sit/stand option whereby one can alternate sitting and standing equally periodically during the day if desired; the claimant can perform manipulative functions frequently; and the claimant must avoid workplace hazards.

Tr. at 17. The ALJ found that Plaintiff is unable to perform any of her past relevant work. Tr. at 22. At the fifth step of the sequential evaluation the ALJ found there is a significant number of jobs which Plaintiff is able to perform. Examples of such jobs are router and office helper. Tr. at 23. The ALJ found that Plaintiff is not disabled nor entitled to the benefits for which she applied. Tr. at 24.

## MEDICAL EVIDENCE

On February 23, 2012, Plaintiff saw Julio Santiago, M.D. for an initial evaluation of low back pain, back stiffness, numbness in the left leg, radicular pain in the right arm, radicular pain in the right leg and numbness and tingling. Plaintiff also complained of chronic neck pain. Plaintiff reported that the condition had lasted two years with no precipitating event. On examination, Plaintiff's neck was normal and symmetrical, without swelling or tenderness. Tr. at 257. The doctor wrote:

> Examination of the back reveals no midline defects, no vertebral or costovertebral angle tenderness, no kyphosis or scoliosis noted, no abnormalities, non tender, no limited range of motion, flexion, extension and lateral bending within normal limits, negative Axial compression, negative hip swivel, negative leg lift on right and left, normal gait, negative straight leg right and left and intact patellar reflexes. Cervical ROM shows normal flexion without pain, normal extension without pain, normal L Tilt without pain, normal R Tilt without pain, normal L Rotation without pain, normal R Rotation without pain.

Tr. at 257-58. After the examination, the doctor diagnosed cervicalgia, chronic neck pain and chronic back pain. The doctor ordered an MRI of the cervical and lumbar spine. The doctor also ordered nerve conduction and EMG studies. The doctor prescribed tramadol for pain. Tr. at 258. An MRI dated March 2, 2012, showed degenerative changes of the lumbar spine at L3/L4 and L4/L5, causing mild central spinal stenosis and mild to moderate bilateral foraminal stenosis. Tr. at 265-66. An MRI

of the cervical spine was reported to be normal. Tr. at 267.

On March 16, 2012, Borislav Nikolov, M.D., wrote a report addressed to Dr. Santiago. Plaintiff presented with complaints of low back pain radiating to her right buttock and down her right leg. Plaintiff reported throbbing and occasionally sharp, shooting pains with electrical like quality down to her leg. Plaintiff reported that the symptoms had begun approximately two years before the evaluation. It was noted that Plaintiff had a history of rheumatoid arthritis. Tr. at 234. Dr. Nikolov administered an EMG/NCV study. The doctor wrote:

> There is no evidence of peripheral polyneuropathy, however, right sural response is absent and also this correlates with absent right ankle jerk. There is some chronic denervation changes primarily in L5, S1 myotomes on the right but no definitive evidence of right S1 root entrapment. I would recommend weight reduction and physical therapy for now. Her MRI imaging of the lower back also correlates the finding of the EMG/NCV study.

Tr. at 235.

On May 17, 2012, Plaintiff saw Michael F. Miniter, M.D. at Quad City Rheumatology. Plaintiff reported that in the previous two months her arthritis had flared, and she complained of pain in her hands, feet, elbows and right jaw. The doctor noted that Plaintiff was working 4-5 hours per day. Plaintiff's height was 63 inches, weight was 216 pounds with a body mass index of 38.3 kg/m². Tr. at 243. On physical examination, many of Plaintiff's joints were tender and the doctor noted 18 positive muscular trigger points. The doctor wrote: "It is difficult to know if her rheumatoid arthritis is active because she has so much tenderness over all her joints. ... She is very symptomatic with fibromyalgia. Tr. at 244. The doctor ordered lab tests and gave Plaintiff a prescription for Vicodin. Tr. at 245.

On July 11, 2012, Plaintiff saw Dr. Miniter. Plaintiff complained of pain in her lower back with radiation down the right leg to the foot. Plaintiff had undergone x-rays, MRI scans, EMG and nerve conduction studies which had not revealed a source of her pain. Plaintiff complained of pain in her hands along with 60 to 90 minutes of morning stiffness. She also reported poor energy. Tr. at 246. After the examination which showed many tender joints, and 18 positive trigger points, the doctor diagnosed rheumatoid arthritis and fibromyalgia. Tr. at 247-48. The doctor wrote that Plaintiff was very symptomatic with fibromyalgia. The doctor made note of lab tests done on May 17, 2012, which showed, among other things, a positive rheumatoid factor. The doctor gave Plaintiff an injection of Kenalog to alleviate some of her symptoms. Tr. at 248.

On July 12, 2012, Plaintiff saw Dr. Santiago. Tr. at 255-56. Plaintiff reported joint stiffness, myalgias, redness and decreased hand grip. Medication included Tramadol for pain. Tr. at 255. On physical examination, the doctor wrote: "Inspection and palpation of bones, joints and muscles reveals left arm, right knee, left knee, right hand and right arm shows evidence of bone deformity, extra-articular edema, stiffness, swelling and tenderness." On neurological examination, Plaintiff's coordination was noted to be good. The doctor diagnosed osteoarthrosis, chronic pain syndrome, and chronic fatigue syndrome. The doctor ordered several lab tests, and advised Plaintiff to followup with rheumatology. Tr. at 256.

On September 18, 2012, Plaintiff saw Dr. Santiago for an exacerbation of rheumatoid arthritis. Tr. at 337-38. Plaintiff was experiencing joint stiffness, myalgias, swelling and warmth. Although the pain

was described as moderate, Plaintiff reported that she was unable to sleep at night and the pain was unbearable. Tr. at 337. On inspection and palpation of Plaintiff's bones, joints and muscles the doctor noted evidence of enlargement, pain, swelling and tenderness on the backs of Plaintiff's hands. The doctor's impression was: "Rheumatoid arthritis exacerbation." The doctor continued Plaintiff's medications and ordered lab tests. Plaintiff was given an injection of depo medrol. Tr. at 338.

On November 9, 2012, Plaintiff saw Dr. Santiago for evaluation of joint pain and for osteoarthritis. Plaintiff complained of pain in her elbows, fingers (left ring finger, right small finger, right ring finger, left index finger and left long finger), hands, knees, shoulders, wrists and sacralcoccyx. Plaintiff's weight was noted to be 214 pounds with a body mass index of 38. Tr. at 335. Although examination of Plaintiff's extremities showed no gross abnormalities, a full range of motion, and normal motor-strength, there was evidence of swelling, stiffness and tenderness in the left shoulder, left arm, left hand, right knee, left knee, right hip, left groin, right forearm and right shoulder. The doctor ordered lab tests including sedimentation rate and quantitative rheumatoid factor. Plaintiff was given a prescription for prednisone in addition to her other medications. Tr. at 336.

On November 21, 2012, Plaintiff saw Dr. Dr. Miniter. Plaintiff reported that the July injection of Kenalog helped for about two weeks after which she had swelling and stiffness. Plaintiff told the doctor about the prescription of prednisone. Plaintiff reported that her hand pain had improved, and her low back continued to hurt. Plaintiff reported morning stiffness lasting 45 to 60 minutes. Plaintiff also reported poor energy. Plaintiff's medications were noted to be flexeril, folic acid, gabapentin, hydorcodone-acetaminophen, imipramine pamoate, methotrexate, nabumetone, prednisone, ranitidine, and tofranil. Tr. at 346. Physical examination consisted of range of motion testing and notations of tenderness over several joints. The doctor noted that Plaintiff's hands did not show full range of motion, and the joints were diffusely tender and revealed mild swelling. The doctor also noted 18 positive trigger points. Tr. at 347-48.

On December 6, 2012, Plaintiff was seen by Dr. Miniter for instruction on how to use Enbrel Sureclick pen injections. Tr. at 344.

On December 10, 2012, Plaintiff saw Dr. Santiago for a discussion regarding smoking cessation. The doctor prescribed chantix and advised Plaintiff not to smoke. Tr. at 333-34.

On March 23, 2013, Plaintiff saw Marc Dicklin, PA for an ear ache in both ears. Tr. at 292-93. When she saw Mr. Dicklin again on April 6, 2013, Plaintiff continued to complain of ear ache. Tr. at 290-91. On May 17, 2013, Plaintiff saw Mr. Dicklin because of a rash on her left shoulder. Tr. at 288-89. Plaintiff returned to Mr. Dicklin on May 20, 2013, because the rash was swollen and was producing copious amounts of purulent fluid. Tr. at 286-87. On June 17, 2013, Plaintiff saw Mr. Dicklin again because of ear ache. Tr. at 284-85. Mr. Dicklin referred Plaintiff to George Kontos, M.D., who saw Plaintiff on July 22, 2013. Dr. Kontos diagnosed a mole on Plaintiff's back which the doctor said should be removed. Tr. at 280-81. The growth was removed on August 5, 2013. Tr. at 316-18.

On October 18, 2013, Plaintiff saw Dr. Santiago for treatment of her back and joint pain. Tr. at 321-23. Plaintiff's medications were listed as enbrel, flexeril, vicodin, gabapentin, methotrexate, and nabumetone. Tr. at 321. The doctor noted that Plaintiff was able to walk with a cane.

On exam, Plaintiff's hands were swollen and tender. Plaintiff's low back showed tenderness and muscle spasm at L4, L5. The doctor's assessment was low back pain, and acute rheumatoid arthritis, and the course was noted to be "worsening." Plaintiff was given injections of norflex, toradol, and depo-medrol. Tr. at 322.

On October 28, 2013, Dr. Santiago saw Plaintiff before he completed a Medical Assessment of Ability to do Work-Related Activities (physical). Tr. at 325-27; Tr. at 295-98 (the form). Under the heading "Interval History," the doctor wrote:

> Side effects of medication decreased. The course is improving. The severity is mild. The effect on daily activities is change in activity level, change in ambulation, change in grooming habits, change in household functions and change in sleeping patterns. Associated symptoms characterized by fatigue, bony deformity, joint instability, joint pain, joint stiffness and muscle weakness.

Tr. at 325. On the form, the doctor wrote that Plaintiff has rheumatoid arthritis. The doctor said that in his medical opinion, Plaintiff was able to work zero hours in a work day. He said Plaintiff would likely be absent from work 30 days each month. The doctor wrote that Plaintiff can stand/walk 4 hours in an 8 hour work day. Tr. at 295. The doctor opined that Plaintiff can sit for four hours a day but less than an hour at a time. The doctor said Plaintiff can occasionally carry less than 10 pounds, and frequently carry less than 5 pounds. The doctor opined that Plaintiff can never climb or crawl; that she can occasionally stoop, crouch and kneel; and, that she can frequently balance. Tr. at 296. The doctor opined that Plaintiff can occasionally handle, finger, and push/pull; and frequently reach, see, hear, and speak. In response to a question "does the impairment cause environmental restrictions?" the doctor checked yes to heights, moving machinery, temperature extremes, chemicals, dust, noise, fumes, humidity, and vibrations. Tr. at 297. The doctor also wrote that Plaintiff experiences chronic fatigue. The doctor wrote that he had treated Plaintiff since 2005. Tr. at 298.

On November 11, 2013, Plaintiff saw Dr. Miniter. Tr. at 329-30. Plaintiff had been out of medication—Enbrel and hydrocodone—for two weeks, and was feeling much more achy. Plaintiff complained of generalized aching with morning stiffness lasting an hour. Plaintiff's energy level was very poor. It was noted that Plaintiff's weight was 229 pounds with a body mass index of 42.14 which the doctor described as "quite elevated." After the examination, the doctor wrote: "Assessment is that she is mainly symptomatic with fibromyalgia. Off the Enbrel her symptoms are worse and also it is possible that some of her tenderness over the extremities may be related to active rheumatoid disease." Tr. at 330.

On December 19, 2013, the Hearing Office Director of the Office of Disability Adjudication and review, sent Dr. Miniter a set of interrogatories asking his opinion of Plaintiff's residual functional capacity. Tr. at 358-66. None of the questions were answered. On January 6, 2014, the uncompleted form was signed by someone whose professional initials are NCMA.

On February 11, 2014, the ALJ sent interrogatories to Ann E. Winkler, M.D. Tr. at 376. Dr. Winkler completed the forms on February 15, 2014. Tr. at 367-75. Dr. Winkler identified Plaintiff's impairments to be rheumatoid arthritis, fibromyalgia, obesity and lumbar degenerative disk disease. Tr. at 367. The doctor opined that Plaintiff's impairments do not meet or equal any listed impairments. Tr. at 368. The doctor opined that Plaintiff can lift and carry 10 pounds frequently (one-third

to two-thirds of the time), and can occasionally (very little to one-third of the time) lift between 11 to 20 pounds. Tr. at 370. The doctor opined that Plaintiff can sit for eight hours per day, four hours at one time without interruption; that Plaintiff can stand three hours per day, an hour at a time; and walk four hours per day, two hours at a time. The doctor opined that Plaintiff does not need a cane to ambulate. The doctor noted the prescription for a cane (Tr. at 350), but also stated that the doctor who prescribed it—Dr. Santiago—had generally shown normal examinations. Tr. at 371. The doctor opined that Plaintiff can frequently use her hands for activities such as reaching, handling, fingering, feeling, pushing and pulling. The doctor opined that Plaintiff can frequently use her feet for operation of foot controls. Tr. at 372. The doctor opined that Plaintiff can never climb ladders or scaffolds; occasionally climb stairs and ramps, and crawl; frequently balance, stoop, kneel and crouch. Tr. at 373. Dr. Winkler opined that Plaintiff can never work at unprotected heights; occasionally, work around moving mechanical parts, be exposed to humidity, wetness, and extreme cold; frequently operate a motor vehicle, and be exposed to vibrations; and continuously be exposed to extreme heat. Tr. at 374. The doctor opined that Plaintiff can perform the following activities: shopping; travel without a companion for assistance; ambulate without using a wheelchair, walker or two canes or two crutches; walk a block at a reasonable pace on rough or uneven surfaces; use standard public transportation; climb a few steps at a reasonable pace with the use of a single hand rail; prepare a simple meal and feed herself; care for her personal hygiene; and, sort, handle, or use paper/files. Tr. at 375.

### ADMINISTRATIVE HEARING

At the hearing on December 17, 2013 (Tr. at 30-51), the ALJ asked Plaintiff if she thought she could do a hypothetical job that involved unskilled work, and which she could sit or stand at will, and would not lift more than five or ten pounds. Plaintiff responded that there are times when she can only sit for five or ten minutes, stand for five to fifteen minutes, and that there are times when she is unable to lift even a cup with her hands. Tr. at 37. Plaintiff said that she spends her days trying to do a few things around her home but that her daughter does most of the house work. Tr. at 39-40.

Plaintiff testified that she has constant pain in her back and in her hands. Tr. at 42. Plaintiff said that medication helps relieve her pain, but she sometimes has problems obtaining it because of insurance difficulties. She said that stretching exercises relieves the pain "a little bit." When asked how long she can walk and stand, Plaintiff responded: "It varies. Anywhere from ... five to 25 minutes. It just depends on it, the nerves." When asked about her ability to sit before needing to stand and stretch, she said: "Usually five, 15, maybe 20 minutes." Plaintiff said she would struggle to lift a gallon of milk. Tr. at 42. Plaintiff said she has good and bad days, but has at least 20 bad days each month. On a bad day, she said: "It's like being set on fire and being smashed with a bat all day long." Plaintiff said she had been seeing Dr. Santiago for eight or nine years, and that it was he who told her to stop working. Tr. at 44. Plaintiff said she uses a cane because she loses her balance and falls. Tr. at 44-45.

After Plaintiff testified, the ALJ called Teresa A. McClain, M.A., C.R.C. to testify as a vocational expert. Tr. at 45. The ALJ asked:

Assume the past work activity the same as claimant's; exertional capacity limited to light work; no climbing of ladders, ropes or scaffolds; other postural func-

tions performed occasionally; need to avoid environmental hazards such as unprotected heights, dangerous machinery; need to avoid concentrated exposure to extreme temperatures. And also manipulative functions for this hypothetical could be performed frequently. How would the past work be affected by those limitations.

In response, the vocational expert testified that Plaintiff's past work of cashier could be performed. The vocational expert testified that if the ALJ found the jobs of childcare worker and bartender to be past relevant work, they could be performed given the limits in the hypothetical. Tr. at 46. When the ALJ changed the manipulative functions from frequently to occasional, the vocational expert testified that past relevant work would precluded. When asked about other jobs for a hypothetical person with Plaintiff's age, education, and past work experience and the limitations set forth by the ALJ, the vocational expert cited jobs such as counter clerk for photo processing, callout operator, systems surveillance monitor, and investigator dealer accounts. Tr. at 47. The vocational expert testified that the job of arcade attendant could also be performed. The ALJ asked if the cited jobs could be performed with the opportunity to alternate sitting and standing periodically during the day. The vocational expert said that investigator dealer account, call out operator, surveillance system monitor and the arcade attendant could be performed with a sit/stand option. Tr. at 48. The vocational expert testified that employers usually tolerate an absence of one time per month, but less for a probationary employee. Tr. at 49. The ALJ asked the vocational expert to reconsider the first hypothetical question—with frequent manipulative ability—along with a sit/stand option. The vocational expert cited jobs such as router and office helper. Tr. at 50.

## ALJ's DECISION

In his decision, the ALJ found "... the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." Tr. at 18.

The ALJ offered the following reasons for disbelieving Plaintiff's allegation of complete and total disability:

> The undersigned concludes that the claimant's allegation of complete and total disability cannot be fully accepted. The claimant does have impairments that can be anticipated to produce a certain amount of pain, but the record does not demonstrate clearly that she has the significantly limited range of motion, muscle spasms, muscle atrophy, motor weakness, sensation loss, difficulty ambulating, or reflex abnormalities which are associated with intense and disabling pain. Additionally, her claims of extremely limited functional capacity are not demonstrated by the medical records. The claimant has been generally noted to have normal flexion, extension and bending of the lumbar spine; the ability to walk with normal gate; no sensory deficits; full motion of the finger joints, hands, elbows, shoulders, cervical spine, hips, knees, ankles, and toes; no abnormalities to her gait and station; 5/5 strength of the muscles; and symmetric reflexes. These findings are consistent with the ability to perform a very broad range of light work. While the claimant was noted to have limited motion of the lumbar spine and wrists, swelling of her hands, and tenderness to multiple joints, these findings do not support the claimant's allegation that she is disabled from all work activity, given her other func-

tional abilities noted above. In addition, these slight limitations have been considered and incorporated into the claimant's residual functional capacity, which limits the claimant to light work with only occasional postural activities and frequent manipulative functions. The claimant's allegation of the need to use a cane to ambulate is not credible; the record does show she was given a prescription for one; this was apparently based on the claimant's subjective complaints as the record documents no basis for the need to use a cane. Dr. Winkler noted the physician who wrote the prescription has generally shown normal neurologic and musculoskeletal exams; further, she has consistently been noted to be able to walk with a normal gait without an assistive device.

Tr. at 20 (internal citation to the exhibits of record omitted). The ALJ wrote that the treatment notes do not support a contention of total disability, and that such a finding was not supported by the MRI scan. *Id.* The ALJ noted Plaintiff's activities of daily living: "she drives, handles her hygiene 'for the most part', does dishes and laundry, and grocery shops." The ALJ noted that the record has no documentation of objective evidence of mechanical limitation or neurological deficit that would prevent Plaintiff from working. Likewise the ALJ found Dr. Santiago's opinion not credible because none of the doctor's statements are supported by any objective medical findings. Tr. at 21. The ALJ noted that Dr. Santiago is not a rheumatologist. The ALJ wrote that Dr. Santiago's opinion was not credible to the extent that it was inconsistent with the ALJ's residual functional capacity assessment.

The ALJ gave great weight to the opinions of Dr. Winkler because ... "they are supported by the record which documents few physical exam findings and no significant findings in her imaging studies."

## DISCUSSION

We will affirm the ALJ's decision "[i]f the ALJ's findings are supported by substantial evidence on the record as a whole," an inquiry that requires us to consider evidence in the record that detracts from the ALJ's decision. *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the decision." *Reutter ex rel. Reutter v. Barnhart*, 372 F.3d 946, 950 (8th Cir.2004).

We will not reverse the ALJ's "denial of benefits so long as the ALJ's decision falls within the 'available zone of choice.'" *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir.2007)). The decision of the ALJ "is not outside the 'zone of choice' simply because we might have reached a different conclusion had we been the initial finder of fact." *Id.* (quoting *Nicola* [*v. Astrue*], 480 F.3d [885] at 886 [ (8th Cir.2007) ]). Rather, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir.2005).

*Owen v. Astrue*, 551 F.3d 792, 798 (8th Cir.2008.) In *Brand v. Secretary of Dept. of Health, Education and Welfare*, 623 F.2d 523, 527 (8th Cir.1980), Chief Judge Lay wrote that *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951) is "the guideline for the evaluation of the standard of review." In *Universal Camera*, the Court wrote:

We conclude, therefore, that the Administrative Procedure Act and the Taft-Hartley Act direct that courts must now assume more responsibility for the reasonableness and fairness of Labor Board

decisions than some courts have shown in the past. Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function. Congress has imposed on them responsibility for assuring that the Board keeps within reasonable grounds. That responsibility is not less real because it is limited to enforcing the requirement that evidence appear substantial when viewed, on the record as a whole, by courts invested with the authority and enjoying the prestige of the Courts of Appeals. The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both.

■ *Id.*, 340 U.S. at 490, 71 S.Ct. 456. In reviewing disability decisions from the Social Security Administration, the Court sits in an appellate capacity and is responsible for giving the agency decision a scrutinizing analysis. This requires the Court to determine the substantiality of the evidence by determining if the ultimate decision is supported by substantial evidence on the record as a whole. *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir.1987).

In *Jackson v. Bowen*, 873 F.2d 1111, 1113 (8th Cir.1989), the Court described its duty as follows:

The district court delineated its standard of review by stating that the Secretary's decision is conclusive if supported by substantial evidence. Such a broad-based search of the record for evidence supporting the Secretary's findings is inappropriate when reviewing an administrative decision. *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir.1987)(citations omitted). Rather the district court's review should be based on whether substantial evidence on the record as a whole supports the Secretary's decision. A notable difference exists between "substantial evidence" and "substantial evidence on the record as a whole":

"Substantial evidence" is merely such "relevant evidence that a reasonable mind might accept as adequate to support a conclusion." "Substantial evidence on the record as a whole," however, requires a more scrutinizing analysis. In the review of an administrative decision, "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." Thus, the court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory.

*Id.* (citations omitted).

■ In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Wilcutts v. Apfel*, 143 F.3d 1134, 1136–37 (8th Cir.1998) citing *Brinker v. Weinberger*, 522 F.2d 13, 16 (8th Cir. 1975).

The most important issue in any disability case which proceeds beyond step three of the sequential evaluation is that of residual functional capacity:

Probably the most important issue will be the question of [residual functional capacity]. ... The RFC that must be found ... is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.

*McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir.1982)(en banc).

■ In her brief, Plaintiff argues that the ALJ did not adequately consider the opinion of the treating physician, Dr. Santiago.

In *Papesh v. Colvin*, 786 F.3d 1126, 1132 (8th Cir.2015), the Court discussed the weight to be given to the opinions rendered by treating physicians. The Court wrote that an ALJ must give controlling weight to a treating physician's opinion if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. *Id.* quoting *Wagner v. Astrue*, 499 F.3d 842, 848–49 (8th Cir.2007). The Court wrote that even if the treating physician's opinion is not entitled to controlling weight, it should not ordinarily be disregarded, and is entitled to either substantial weight or limited weight. *Id.* The Court went on to note that the opinions of nonexamining medical sources are generally, but not always, given less weight than those of examining sources. *Id.* at 1133.

■ An ALJ is charged with finding the residual functional capacity based on all the evidence in the record but residual functional capacity is a medical question, and must be supported by some medical evidence. *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir.2001) citing *Ford v. Secretary of Health and Human Services*, 662 F.Supp. 954 (W.D.Ark.1987), and *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir.2000).

In the case at bar, the ALJ relied on the report of Dr. Winkler to support his finding of residual functional capacity. Dr. Winkler did not examine Plaintiff, but only reviewed the treatment notes in the record. Dr. Winkler's opinion stands in contrast to that rendered by Dr. Santiago who has a long term treatment relationship with Plaintiff. However, there are some inconsistencies in Dr. Santiago's opinion which the ALJ should resolve. For example, on the same day that Dr. Santiago

answered the interrogatories, he noted that the side effects of Plaintiff's medication had decreased and that there were changes in many of Plaintiff's abilities. Nevertheless, in the same paragraph, the doctor wrote that Plaintiff's illness is characterized by fatigue, bony deformity et cetera.

Plaintiff was treated for her impairments by both Dr. Santiago and Dr. Miniter. On remand, both doctors should be asked to write a report which comports with 20 C.F.R. § 404.1513(b)(1-6). That regulation sets forth what a medical report should include. Courts have recognized the inadequacies of "checklist" type forms which are presented to doctors for a quick response. For example, in *Papesh*, at 1133, the Court noted the limited evidentiary value of such forms because of the generality and incompleteness of the checklist format.

■ Although not raised by Plaintiff, the Court would note that the reasons given for discrediting Plaintiff's testimony will not pass muster under the standards agreed to in *Polaski v. Heckler*, 739 F.2d 1320, 1321–22 (8th Cir.1984) and it's progeny. The reasons given by the ALJ for discrediting Plaintiff's subjective complaints focus on what the ALJ perceives to be a lack of objective medical evidence. As noted above, Plaintiff has established with medical evidence that she has severe impairments which prevent her from performing any of her past relevant work. "While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." *Id.* Although Plaintiff's daily activities are a factor to be considered, "... we have held, in the context of a fibromyalgia

case, that the ability to engage in activities such as cooking, cleaning, and hobbies, does not constitute substantial evidence of the ability to engage in substantial gainful activity." *Brosnahan v. Barnhart*, 336 F.3d 671, 677 (8th Cir.2003).

In light of the foregoing discussion, it cannot be said that the final decision of the Commissioner is supported by substantial evidence on the record as a whole. The Commissioner argues that if the Court so finds, that the proper remedy is to remand for further administrative proceedings rather than for an award of benefits. In this case, the Court agrees with the Commissioner that the proper remedy is a remand for further administrative proceedings and for a new decision consistent with this opinion.

## CONCLUSION AND DECISION

The Court has considered the evidence which supports, as well as the evidence which detracts from the decision made by the ALJ. After applying the balancing test noted in *Gavin v. Heckler*, 811 F.2d at 1199, and cases cited therein, this Court holds that the final decision of the Commissioner is not supported by substantial evidence on the record as a whole. The final decision of the Commissioner is reversed and remanded.

The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412 (d)(1)(B) (Equal Access to Justice Act). *See also, McDannel v. Apfel*, 78 F.Supp.2d 944 (S.D.Iowa 1999) (discussing, among other things, the relationship between the EAJA and fees under 42 U.S.C. § 406 B), and LR 54.2(b)[1]. *See also, Gisbrecht v. Barnhart*, 535 U.S. 789, 122 S.Ct. 1817, 1821, 152 L.Ed.2d 996 (2002);

*Mitchell v. Barnhart*, 376 F.Supp.2d 916 (S.D.Iowa 2005).

IT IS SO ORDERED.

---

1. N.B. Counsel is reminded that LR 54.2 (b), states that an EAJA application "must specifically identify the positions taken by the government in the case that the applicant alleges were not substantially justified."